[S. F. No. 18349.   In Bank.   Oct. 17, 1952.]

LEONARD T. POCKMAN, Petitioner, v. J. PAUL LEON-
ARD, as President of San Francisco State College et al.,
Respondents.

Wayne M. Collins for Petitioner.

Edmund G. Brown, Attorney General, H. H. Linney, Chief Assistant Attorney General, and Herbert E. Wenig, Deputy Attorney General, for Respondents.

GIBSON, C. J.—This is an original proceeding in mandamus brought by an associate professor at San Francisco State College to compel respondents to certify his name on the public payroll and to pay him salary which was withheld because of his failure to execute the oath required by sections 3100-3109 of the Government Code, known commonly as the Levering Act. (Stats. 1951 [3d Ex. Sess. 1950, ch. 7], p. 15.)

The statute declares that all public employees are "civil defense workers, subject to such civilian defense activities as may be assigned to them by their superiors or by law," and it defines public employees as all persons employed by the state or any county, city, city and county, state agency or public district, excluding aliens legally employed. (Gov. Code, §§ 3100-3101.) "Subject to the provisions of Section 3 of Article XX of the Constitution," all civil defense workers are required to take the oath prescribed by section 3103 of the Government Code within the first 30 days of employment. (Gov. Code, § 3102.) It is further provided that no compensation shall be paid to any civil defense worker by any public agency unless he has subscribed to the oath, and that it shall be the duty of the person certifying to public payrolls to ascertain and certify that the oath has been taken by such workers. (Gov. Code, § 3107.) Section 3108 declares that it is perjury to make false statements in the oath, and section 3109 makes it a felony for a person, after taking the oath and while in public employment, to advocate or become a member of an organization which advocates overthrow of the government by force or other unlawful means. The remaining sections (Gov. Code, §§ 3104-3106) specify the manner of taking and filing the oath and provide that compliance with the act shall be deemed compliance with Government Code sections 18150-18158* relating to the taking of oaths by state employees.

The act went into effect October 3, 1950. Petitioner failed to take the required oath within 30 days thereafter, and respondents refused to certify his name to the public payroll

---

*Gov. Code, §§ 18150-18158, provide that every person appointed to a state position, whether civil service or noncivil service, shall within 30 days of appointment take a prescribed oath which is the same as that set forth in Const., art. XX, § 3.

or to pay his salary for services rendered during the months of October and November.

The first question is whether the provisions which declare public employees to be civil defense workers, "subject to such civilian defense activities as may be assigned to them by their superiors or by law," render the entire act invalid. (Gov. Code, §§ 3100-3101.) Petitioner asserts that the statute imposes on public employees a rule of martial law and "herds them into a headless, tailless and nondescript military body." There is nothing in the act, however, which purports to conscript public workers into military service or which declares them to be subject to martial law. Petitioner also claims that the act improperly subjects him to assignment to activities outside and beyond his regular duties. It is clear, however, that a teacher may properly be assigned certain duties relating to civil defense, such as the instruction of pupils regarding their behavior during atomic explosions, air raids or other attacks. Tasks of this type, like the holding of fire drills, are within the scope of the duties of a teacher and may be properly required of him regardless of the fact that they may also constitute civil defense activities. There is no complaint that any specific civil defense duties have been imposed on petitioner under the act, and we should not assume that any improper assignments will be made. The provision that workers are subject to such activities "as may be assigned to them by their superiors or by law" does not, as asserted, invalidly delegate legislative power to define and impose civil defense duties. Instead, the reasonable construction is that the superiors, in making assignments, are limited to such authority as they already have or may subsequently be granted by law.

We turn now to other arguments made by petitioner. The oath which he has refused to take reads as follows:

"I, _____ do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; that I will bear true faith and allegiance to the Constitution of the United States and the Constitution of the State of California; that I take this obligation freely, without any mental reservation or purpose of evasion; and that I will well and faithfully discharge the duties upon which I am about to enter.

"And I do further swear (or affirm) that I do not advocate, nor am I a member of any party or organization, political or

otherwise, that now advocates the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means; that within the five years immediately preceding the taking of this oath (or affirmation) I have not been a member of any party or organization, political or otherwise, that advocated the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means except as follows:

---

(If no affiliations, write in the words 'No Exceptions')

and that during such time as I am a member or employee of the _____ I will not
(name of public agency)

advocate nor become a member of any party or organization, political or otherwise, that advocates the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means.'' (Gov. Code, § 3103.)

Section 3 of article XX of the state Constitution provides:

''Members of the Legislature, and all officers, executive and judicial, except such inferior officers as may be by law exempted, shall, before they enter upon the duties of their respective offices, take and subscribe the following oath or affirmation.

''I do solemnly swear (or affirm, as the case may be,) that I will support the Constitution of the United States and the Constitution of the State of California, and that I will faithfully discharge the duties of the office of _____, according to the best of my ability.

''And no other oath, declaration, or test shall be required as a qualification for any office or public trust.''

When petitioner was appointed to the state college faculty in 1946 he took an oath identical to that prescribed in section 3 of article XX, and he argues that he is exempted by the last sentence of that section from taking any ''other oath, declaration or test'' and, hence, cannot be required to take the oath prescribed by section 3103 of the Government Code.

When resort is had to the historical background of the constitutional provision, it appears that the words ''oath, declaration or test'' have an important connotation in connection with qualifications for public service. The English ''test'' act of 1673, which was so odious to the people, required all civil and military officers to take ''oaths'' of allegiance and

682

supremacy and to make "declarations" regarding matters of opinion, particularly religious beliefs. (Stat. 25 Car. II, c. 2; see 4 Blackstone Commentaries 59.) This act was undoubtedly in the minds of the framers of state Constitutions when they used these words in drafting constitutional provisions similar to ours. (*People* v. *Hoffman* (1886), 116 Ill. 587 [5 N.E. 596, 605, 8 N.E. 788, 56 Am.St.Rep. 793]; *Attorney General* v. *City of Detroit* (1885), 58 Mich. 213 [24 N.W. 887, 889-890, 55 Am.Rep. 675]; *Rogers* v. *City of Buffalo* (1888), 3 N.Y.S. 671, 673-674, affirmed, 123 N.Y. 173 [25 N.E. 274, 278-279, 9 L.R.A. 579]].)

The prohibition contained in section 3* was considered in the early case of *Cohen* v. *Wright*, 22 Cal. 293, where it was said at page 310, "In our judgment it was not intended to limit the action of the Legislature to the particular set form of words used in the Constitution, and it is clearly within their power to prescribe any form, so that they do not go beyond the intent, object and meaning of the Constitution." And in *Bradley* v. *Clark*, 133 Cal. 196, 201 [65 P. 395], it was stated that the language in section 3 "leaves as the only matter for determination the single question, whether [the statute there involved] does impose an oath or test substantially different from that prescribed by the Constitution."

In this connection, it would seem clear that any oath or declaration which imposes a religious or political test is prohibited. (See *Bradley* v. *Clark*, 133 Cal. 196, 201 [65 P. 395]; *Rogers* v. *City of Buffalo, supra*, 3 N.Y.S. at pp. 673-674; *Attorney General* v. *City of Detroit, supra*, 24 N.W. at p. 890 [concurring opinion]; *cf. United Public Workers* v. *Mitchell*, 330 U.S. 75, 100 [67 S.Ct. 556, 91 L.Ed. 754].) It has been recognized, however, that such a constitutional prohibition does not prevent the examination of public employees, for skill, education, or other qualities reasonably related to qualifications for public service. As said in *Rogers* v. *City of Buffalo*, 123 N.Y. 173 [25 N.E. 274, 278, 9 L.R.A. 579], in answer to a contention that "nothing but the bare oath" mentioned in the Constitution could be required, "We do not think that the provision above cited was ever intended to have any such broad construction. Looking at it as a matter of common sense, we are quite sure that the framers of our organic law never intended to oppose a constitutional barrier to the right of the people through their legislature

*At the time of the Cohen case the provision appeared in § 3, art XI, Const. of 1849.

to enact laws which should have for their sole object the possession of fit and proper qualifications for the performance of the duties of a public office on the part of him who desired to be appointed to such office." (See, also, *Attorney General* v. *City of Detroit*, 58 Mich. 213 [24 N.W. 887, 889-890, 55 Am. Rep. 675].)

Before proceeding to determine whether the oath set forth in section 3103 of the Government Code is substantially the same as the constitutional oath, we shall consider respondents' contention that petitioner is not entitled to the benefit of the constitutional prohibition because, it is asserted, he is not the holder of an "office or public trust" within the meaning of that provision. ▮▮▮ The terms "office" and "public trust" have been said to be nearly synonymous (*Ex parte Yale*, 24 Cal. 241, 243 [85 Am.Dec. 62]), but the particular positions to which they apply have not been clearly defined. Different results have been reached in classifying public positions involving similar duties and responsibilities, and the meaning and extent of the term "office" tends to vary with the purpose of the statute in which it appears. (See, for example, *Patton* v. *Board of Health*, 127 Cal. 388, 393-397 [59 P. 702, 78 Am.St.Rep. 66]; *People* v. *Wheeler*, 136 Cal. 652, 654-655 [69 P. 435]; *Wall* v. *Board of Directors*, 145 Cal. 468, 471-472, 473 [78 P. 951]; *Coulter* v. *Pool*, 187 Cal. 181, 185-187 [201 P. 120]; *Spreckels* v. *Graham*, 194 Cal. 516, 525-532 [228 P. 1040]; *Brooks* v. *City of Gilroy*, 219 Cal. 766, 770-772 [29 P.2d 212]; *People* v. *Rapsey*, 16 Cal.2d 636, 639-640 [107 P.2d 388]; Sims, *"What is a Public Office in California,"* 8 So.Cal.L.Rev., 11 [1934].) Accordingly, the cases which have dealt with the term in construing statutes unrelated to the subject involved here are not particularly helpful, and we must look to the purposes of section 3 in order to ascertain the intention of its framers.

▮▮▮ There is no merit in respondents' suggestion that the only persons entitled to the benefit of the prohibition are members of the Legislature, judges and the seven executive officers mentioned in article V of the Constitution.* The provision of section 3 requiring the oath to be taken by all officers, except "inferior officers" exempted by the Legislature, shows that the requirement is not limited to the persons named in

---

*Those officers are: governor, lieutenant governor, secretary of state, controller, treasurer, attorney general and surveyor general. Pursuant to Const., art. V, § 19, the office of surveyor general was abolished by Pol. Code § 690, in 1929.

article V and that it at least includes all inferior officers who are not exempted. It would do violence to the plain meaning of the words used if the section were read as providing that the Legislature might exempt "inferior officers" from taking the prescribed oath and at the same time compel them to take some other kind of "oath, declaration or test."

We are unable to find any place where a line can reasonably be drawn so as to place some positions within and others outside the constitutional prohibition, and, in our opinion, there is no justification for excluding any public servants from its protection. The prohibition should therefore be read as applying to every state and local officer and employee. This construction is in accord with the basic purpose of safeguarding the public and its servants by forbidding oaths and declarations regarding matters that bear no reasonable relationship to governmental service and particularly those that involve political and religious beliefs. Persons in the lower levels of government are just as much entitled to this protection as those in higher positions. Any other interpretation of the prohibition would lead to the absurd result that the relatively few persons who occupy the most important positions could be required to take only the constitutional oath, while those who work under them and execute their orders could be compelled to submit to various other oaths, declarations and tests.

We come now to the question whether there is any substantial difference between the oaths prescribed by the state Constitution and by section 3103 of the Government Code. The constitutional oath consists of a declaration or pledge of loyalty to the state and federal Constitutions, and a promise or pledge of faithful performance of duty. The first paragraph of the oath required by section 3103 contains substantially the same pledge of loyalty and faithful performance of duty as that found in the constitutional oath, with only immaterial differences in language. In the second paragraph the affiant swears to three matters, namely, (1) that he does not advocate or belong to any organization that advocates overthrow of the government by force or violence or other unlawful means; (2) that within the five years immediately preceding the taking of the oath he has not been a member of any such organizations except those which he lists in the space provided on the face of the oath; and (3) that while employed by the designated agency he will not

advocate or become a member of any organization that advocates such doctrines.

█ It should be noted at the outset that the oath provisions relating to membership can reasonably be construed as referring only to affiliation with organizations *known* by the employee to belong to the proscribed class, and each clause of the oath must be interpreted as requiring knowledge of the character of any group as to which a declaration is required. (See *Garner* v. *Los Angeles Board,* 341 U.S. 716, 723-724 [71 S.Ct. 909, 95 L.Ed. 1317].)

The first and third parts of the second paragraph are essentially a declaration of present and future loyalty to the government of this state and of the United States. A person obviously cannot be loyal to a government and at the same time advocate its violent and unlawful overthrow. By the same token, voluntary unexplained membership in an organization known by a public employee to advocate such doctrines indicates that he has interests which are inconsistent with his pledge of loyalty and faithful performance of duty, and the Legislature, by requiring this oath, has in effect found that such membership is incompatible with loyalty.* In the recent case of *Adler* v. *Board of Education of City of New York,* 342 U.S. 485 [72 S.Ct. 380, 386, 96 L.Ed. 517], the United States Supreme Court sustained as reasonable an implied legislative finding that ''the member by his membership supports the thing the organization stands for, namely the overthrow of the government by unlawful means.''

█ The middle part of the second paragraph of the oath calls for disclosure of information relating to past loyalty. In it the affiant is required to list any organizations, to which he has belonged in the five years preceding taking of the oath, that advocated overthrow of the government by force or violence or other unlawful means. Information as to past affiliations may be relevant in determining whether an employee can be placed in a position of present or future public responsibility. (See *Garner* v. *Los Angeles Board,* 341 U.S. 716, 720 [71 S.Ct. 909, 95 L.Ed. 1317]; *Adler* v. *Board of*

---

*Since 1947 Gov. Code, § 1028 has provided: ''It shall be sufficient cause for the dismissal of any public employees including teachers in the public schools or any state supported educational institution when such public employee or teacher advocates or is a member of an organization which advocates overthrow of the Government of the United States or of the State, by force, violence, or other unlawful means.''

*Education of City of New York*, 342 U.S. 485 [72 S.Ct. 380, 385, 96 L.Ed. 517].) Nothing in section 3 of article XX is intended to prevent the state from requiring disclosure of facts relating to an employee's fitness and suitability for public service, and inasmuch as this portion of the oath, in effect, calls for a statement of past loyalty which is relevant to present and future loyalty, it is in no way inconsistent with the spirit or intent of the constitutional oath.

The oath required by section 3103 is obviously not a test of religious opinion. Neither does it compel disavowal of any political belief or membership in any named political party. While it requires the affiant to swear that he does not advocate, or belong to any party or organization which advocates overthrow of the government by force or violence or other unlawful means, these may not properly be called matters of political opinion. The word "political" imports orderly conduct of government, not revolution, and the term is not applicable to advocacy of a belief in overthrow of the government by force or violence. (See *Lockheed Aircraft Corp.* v. *Superior Court*, 28 Cal.2d 481, 485 [171 P.2d 21, 166 A.L.R. 701].)

We are satisfied that there is nothing in the Levering oath which goes beyond the object or meaning of section 3 of article XX and that it is not the type of "other oath, declaration or test" which was intended to be prohibited by that section.

Nearly all of the contentions made by petitioner concerning asserted violations of federal constitutional guarantees are answered adversely to him by recent decisions of the United States Supreme Court. It has been held that a governmental body has the right to direct that its employees shall not belong to organizations which they know advocate overthrow of the government by force or other unlawful means, and that they may be required to make sworn statements similar to the oath prescribed by section 3103 as a condition to obtaining or continuing in public employment. (*Adler* v. *Board of Education of the City of New York*, 342 U.S. 485 [72 S.Ct. 380, 96 L.Ed. 517] ; *Garner* v. *Los Angeles Board*, 341 U.S. 716 [71 S.Ct. 909, 95 L.Ed. 1317] ; *Gerende* v. *Board of Supervisors of Elections*, 341 U.S. 56 [71 S.Ct. 565, 95 L.Ed. 745] ; cf. *Dennis* v. *United States*, 341 U.S. 494 [71 S.Ct. 857, 95 L.Ed. 1137] ; *American Communications Assn.* v. *Douds*, 339 U.S. 382 [70 S.Ct. 674, 94 L.Ed 925].) A person's associates, as well as his conduct, are relevant factors in deter-

mining fitness and loyalty, and the state, under its police power, may properly limit a person's freedom of choice between membership in such organizations and employment in the school system. (*Adler* v. *Board of Education of the City of New York,* 242 U.S. 485 [72 S.Ct. 380, 385, 96 L.Ed. 517].)

Past conduct and loyalty have a reasonable relationship to present fitness and trustworthiness, and public servants may properly be required to furnish information regarding past membership in organizations that to their knowledge advocated the overthrow of government by force or other unlawful means. (See *Garner* v. *Board of Public Works,* 341 U.S. 716, 719-720 [71 S.Ct. 909, 95 L.Ed. 1317].)

The fact that divulging past or present membership may, under some circumstances, amount to self-incrimination does not render the act invalid since the disclosure of the required information is a reasonable condition or qualification of employment. (See *Christal* v. *Police Commission,* 33 Cal. App.2d 564 [92 P.2d 416] ; 64 Harv.L.Rev., 987-996; 28 Cal. L. Rev., 94-95; *cf. United Public Workers* v. *Mitchell,* 330 U.S. 75 [67 S.Ct. 556, 91 L.Ed. 754].)

Petitioner is a permanent employee of the college with teacher's tenure, and he claims that the act has been applied so as to impair contractual obligations. Even if we assume that petitioner has a contract right to his position, there can be no question that an implied condition of the agreement is that he will be loyal to the government and that he will not advocate its overthrow by force. Under its police power the state may, as a means of implementing the implied condition, require its employees to make a declaration of loyalty and furnish relevant information. "The policy of protecting contracts against impairment presupposes the maintenance of a government by virtue of which contractual relations are worth while, —a government which retains adequate authority to secure the peace and good order of society." (*Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U.S. 398, 435 [54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481] ; *cf. East New York Sav. Bank* v. *Hahn,* 326 U.S. 230, 232 [66 S.Ct. 69, 90 L.Ed. 34, 160 A.L.R. 1279] ; *Lincoln Union* v. *Northwestern Co.,* 335 U.S. 525, 531-532 [69 S.Ct. 251, 93 L.Ed. 212, 6 A.L.R.2d 473] ; *Veix* v. *Sixth Ward Bldg. & L. Assn.,* 310 U.S. 32, 38 [60 S.Ct. 792, 84 L.Ed. 1061].) It appears, however, that respondents applied the act improperly

in withholding payment for services rendered by petitioner prior to the date on which he was required by law to take the oath. (Stats. 1951 [3d ex. sess. 1950, ch. 7, § 2] pp. 15, 17.) Employees were given a 30-day period of grace after the effective date of the act within which to decide whether or not they would take the oath, and it would be unreasonable to hold that the Legislature intended to require a forfeiture of the salary earned during this period in the event that an employee chose to leave his position rather than comply with the condition.

It follows that petitioner is entitled to compensation for services rendered up to and including 30 days following October 3, 1950, the effective date of the statute, but, having failed to take the oath, he is not entitled to compensation for any subsequent period.

Insofar as petitioner seeks payment of salary or other relief for any period subsequent to 30 days after October 3, 1950, the application is denied. Let a writ of mandate issue for the limited purpose of directing payment of petitioner's salary up to and including 30 days after October 3, 1950.

Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The only word of commendation which I can speak for the opinions of the court in these cases is that they bring into sharp focus the loyalty oath hysteria which has pervaded this country and particularly this state during the past five or six years. The concept that a person exposed to subversive activity may be immunized against such exposure by the taking of a so-called loyalty oath opens the door for vast exploration in the field of metaphysical research. While this process is taking place the loyalty of every public employee is impugned even though he has taken the oath prescribed by the Constitution many times and has obeyed it religiously. It must be conceded, however, that those who have been loyal may become disloyal and that "eternal vigilance is the price of liberty," but it should not follow that vigilance against disloyalty of public employees requires that they take an oath proscribed by the Constitution. The holding of the majority in these cases requires the taking of such an oath.

From the records before us in the various cases decided by the opinions this day filed, it would appear that many days,

weeks and possibly months were consumed by the state Legislature, the Board of Regents of the University of California and the various boards of supervisors and city councils of the counties and cities of California in the preparation, discussion and adoption of various loyalty oath proposals. In addition to the time consumed in the legislative field, these cases have been before the various courts of this state during the past two or three years where thousands of pages of transcripts and briefs have been prepared and filed and the time and effort of numerous judges and lawyers has been consumed in their disposition. In my opinion all of this time and effort, as well as the money necessarily expended in connection with the legislation and judicial proceedings, which must have amounted to thousands, if not millions of dollars, was, and is entirely wasted, and has been and will be of no benefit whatsoever either to the general public or the individuals affected thereby. There can be no escape from this conclusion when we consider that the Constitution of this state expressly and specifically declares the form of oath required of all persons holding any public position under the law of this state, and expressly provides that: "No other oath, declaration or test shall be required as a qualification for any office or public trust." (Cal. Const., Art. XX, § 3.) The oath prescribed by the Constitution is a simple, concise declaration, solemnly made by the person taking it, that he will support the Constitution of the United States and the Constitution of the State of California and faithfully discharge the duties of the office or employment which he is undertaking to the best of his ability. The constitutional provision, by implication at least confers upon the Legislature the power to require that this oath be taken by all who occupy any office or public trust under the law of this state and the Legislature saw fit to require that all state employees take such oath. (See Gov. Code, § 18150 et seq.) It is a conceded fact in each of these cases that every employee of the state here involved took the constitutional oath long before the enactment of the acts which constitute the basis of this litigation. Notwithstanding this undisputed fact, the majority of this court holds in each of these cases that these petitioners are required to take another oath prescribed by the so-called Levering Act (Stats., 1951 [3d ex. sess. 1950, ch. 7, p. 15]) which, it is said, is no different than the oath prescribed by the Constitution. The majority nevertheless holds that because each of the petitioners has failed to take the oath prescribed by the Levering

Act, they have forfeited their position with the state in accordance with the provisions of that act. This is indeed strange and paradoxical reasoning. In effect the majority says: No employee of the state is required to take any other oath than that prescribed by the Constitution, but even though all employees of the state have taken the constitutional oath, they must also take the Levering Act oath which is the same as that prescribed by the Constitution, and if they do not take the Levering Act oath, they are ineligible for employment by the state. If there is any logic or common sense in such reasoning, it is not apparent to me and I have grave doubt that it will appeal to any thinking person.

I have no doubt as to the good intentions of the various legislative bodies which adopted these loyalty oath proposals, and I do not consider it the function of the judicial branch of the government to pass upon the wisdom of such proposals. The sole and only question before the courts is whether the enactments contravene some provision of the fundamental law—the Constitution. This is true even though a very grave question of public policy may be involved. It is for the Legislature and not the courts to declare the public policy of the state, providing such declaration is not in conflict with the Constitution.

We are therefore met at the outset of this discussion with the problem of what was intended by the framers of the Constitution when they wrote into article XX, section 3, the words: ''And no other oath, declaration, or test shall be required as a qualification for any office or public trust.''

The section as it now appears in the Constitution of 1879 is precisely the same, word for word, as it was in the Constitution of 1849. There it was article XI, section 3. (Browne, The Debates in the Convention of California on the Formation of the State Constitution, Wash. 1850, App. X.) Though there was debate on changing the language in the 1878 Convention, *no change was made.*

It seems clear that what the delegates to the original convention in Monterey in 1849 had in mind is the mandate of article VI, clause 3, of the federal Constitution and the experience leading up to the adoption of that clause. The debate in the 1849 Convention was singularly short. The committee which brought in the clause proposed the following (Browne, Debates, p. 255) : ''Members of the Legislature, and all officers, before they enter upon the duties of their offices, shall take the following oath or affirmation: I (A B) do solemnly swear

(or affirm), that I will faithfully and impartially discharge and perform all the duties incumbent on me as ———, according to the best of my abilities and understanding, agreeably to the Constitution and Laws of the United States, and of this State; and I do further solemnly swear (or affirm) that since the adoption of the present Constitution, I, being a citizen of this State, have not fought a duel with deadly weapons within this State, nor out of it, with a citizen of this State, nor have I sent or accepted a challenge to fight a duel with deadly weapons, with a citizen of this State, nor have I acted as second in carrying a challenge, or aided, or advised, or assisted any person thus offending. So help me God.''

Thus it will be seen that the committee proposed that all members of the Legislature and ''all officers'' take an oath in two parts, one as to the Constitution of the State and of the United States and the other as to not having participated in a duel. (The convention had just adopted article XI, section 2, providing that anyone who after the adoption of the Constitution participated in a duel shall be deprived of, *inter alia,* holding any office of profit under the Constitution. Browne, Debates, p. 255.)

Mr. Halleck thereupon proposed a substitute in the language of the present article XX, section 3, because ''this substitute was the most simple he would find *on the subject* in any of the Constitutions.'' (Emphasis added.) (Browne, Debates, p. 256.) Mr. McDougal opposed the substitute on the ground that the section as proposed by the committee was necessary to carry out the object of the preceding section. A vote was taken on the substitute: it was adopted, and became a part of the proposed Constitution.

A comparison of the language of article XI, section 3, now article XX, section 3, shows a striking similarity to the language of article VI, clause 3, of the federal Constitution. A look at the federal constitutional debates should therefore prove helpful.

The idea that the legislative, executive and judicial officers, within the several states, ought to be bound by oath to support the Articles of the Union was proposed by Mr. Randolph (5 Elliott, Debates on the Federal Constitution 128), Messrs. Sherman, Gerry and Luther Martin felt the requirement intruded improperly on the states, but Mr. Randolph's idea prevailed (5 Elliott 183, 351, 352). During the debate Mr. Wilson said ''he was never fond of oaths, considering them as left handed security only. A good government did not need

them, and a bad one could not or ought not to be supported.'' (5 Elliott 352.)

The idea that ''no religious test or qualification shall ever be annexed to any oath of office under the authority of the United States'' was first proposed to the convention by Mr. Pinckney (5 Elliott, 446, 498), Mr. Sherman thought it unnecessary, ''the prevailing liberality, being a sufficient security against such tests.'' (5 Elliott, 498.) But the convention was cautious and adopted Mr. Pinckney's views (5 Elliott, 598), just as the whole country was cautious in insisting on the first ten amendments, now known as ''The Bill of Rights.''

The two ideas were combined and emerged as Article VI, clause 3 (5 Elliott, 564). Thus, it appears, if anything, that the California delegates, though taking a leaf from the federal Constitution, went further and proscribed not only religious test oaths, as had the federal delegates, but *any* test oath.

Nor did the debates in the 1878 convention change the picture. Four amendments to the 1849 language were suggested. All of them were defeated. (III Debates and Proceedings of the Constitutional Convention of the State of California [1878], pp. 1390-1391.) The first dealt with a requirement of bonds for sheriffs and marshals. The second deleted the word ''executive,'' replaced it with ''ministerial'' and added oath requirements as to dueling, bribery, and employment of Asiatics. The third was an amendment to the second and deleted the words ''members of the legislature,'' ''judicial'' and ''ministerial,'' and added the words ''state, county, township, district and municipal, executive, legislation, judicial and ministerial.'' The fourth struck out the word ''test.''

Each of these suggestions was defeated, one by one. If anything can be gleaned from this legislative history, it is that the delegates of 1878 determined to leave the provision as it had always been—in simple language meaning what it said: That only *one* oath could be required for those in the public employ and *one* only. The abhorrence for test oaths for the servants of the public which prevailed in Monterey in 1848 and in Philadelphia in 1787 prevailed in Sacramento in 1878. It would prevail today were it not for the hysteria and name calling which has tended to obscure the traditional concept of the framers of both Constitutions.

It should be noted that the Levering Act oath is strikingly similar in its language and tone to the third and fourth amendments suggested at the Constitutional Convention of 1878. Indeed the first paragraph of the Levering Act is almost

identical, word for word, with the first paragraph of the defeated 1878 amendments. And the second paragraph resounds as though in echo to the sentiments which moved the gentlemen in 1878 to propose an oath that one had not employed Asiatics.

But historical coincidence aside, the Levering Act oath and the constitutional oath are as different as day from night both in content and intent. In the first place, the constitutional oath is not a perjury oath. It relates to a state of mind, a promise in good faith to perform one's duties to the best of one's abilities. That an oath of office as relates to the future performance of duties does not relate to perjury was recognized by the Legislature even before the 1879 Constitution was enacted. (See Pen. Code, § 120.) Furthermore, it is clear that the constitutional oath is a promissory declaration intended to solemnize an occasion and to impress upon the mind of the employee the trust upon which he is about to enter. It is not intended to inhibit one's thinking nor one's associations.

The majority holds that "We are satisfied that there is nothing in the Levering oath which goes beyond the object or meaning of section 3 of Article XX and that it is not the type of 'other oath, declaration or test' which was intended to be prohibited by that section." With this statement, I most emphatically disagree. The constitutional oath relates to the future: "I do solemnly swear (or affirm, as the case may be) that I *will* support the Constitution of the United States and the Constitution of the State of California, and that I *will* faithfully discharge the duties of . . . ." There can be no other meaning than *that from the time of taking employment and the oath the affiant will support the constitutions.* The Levering oath, on the other hand, calls for an oath regarding past activities: "that within the five years immediately preceding the taking of this oath (or affirmation) I have not been a member of any party or organization, political or otherwise, that advocated . . ." So far as the balance of the Levering Act is concerned, it might possibly be inferred from the constitutional oath that in swearing to support the two constitutions, the affiant impliedly swears to defend them "against all enemies, foreign and domestic" and that he would not become a member of any organization advocating the overthrow of the two governments by force and violence since the two matters just set forth would be, in reality, one and the same

thing. But the fact remains that the words so stating are *not* in the constitutional oath except by implication. No such implication may be read into the constitutional oath with respect to that portion of the Levering Act relating to *past* affiliations. The above quoted statement from the majority opinion is deceptive in its simplicity in that it seeks to uphold the Levering Act, since that is the popular thing to do, but must in some manner avoid the clear, positive and unequivocal mandate of the Constitution that "no other oath, declaration or test shall be required as a qualification for any office or public trust." The only way to avoid that provision is to say that there is no substantial difference between the two oaths. And to say that there is no substantial difference between the two is the heighth of absurdity. As was said in *Sheehy* v. *Shinn,* 103 Cal. 325 [37 P. 393], the Constitution will not be so construed as to permit an evasion of it; and to give effect to that instrument it has been declared to be as much the duty of the court to see *that it is not evaded as that it is not directly violated.* Inasmuch as constitutional provisions are, and have always been, unless expressly provided to the contrary, to be construed as prospective in operation, what can the result reached here be considered but an evasion of the provision declaring that no other oath, declaration or test *shall* be required?

If, as stated by the majority, there is no substantial difference between the two oaths, it would appear that the Levering Act adds nothing to the constitutional oath and is, therefore, a nullity. All these petitioners have taken the constitutional oath and, if the two are the same, there appears to be no sound reason why they should lose their positions and means of earning a livelihood because they have refused to do a useless act. The law does not require useless acts (or so we have always been told), but if we follow the reasoning of the majority to its illogical conclusion, the law does require, on pain of dismissal from employment, the doing of such an act.

An act of government undertaken without constitutional authority and in excess of constitutional limitations is a nullity in law and may properly be disobeyed or resisted. "The constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the Legislature shall please to alter it.

"If the former part of the alternative be true, then a legislative act contrary to the constitution is not law; if the latter part be true, then written constitutions are absurd attempts, on the part of the people, to limit a power in its own nature illimitable.

"Certainly all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and, consequently, the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void." (*Marbury* v. *Madison,* 1 Cranch 137, 177.)

It is admitted by the majority that the two early cases of *Cohen* v. *Wright,* 22 Cal. 293 and *Bradley* v. *Clark,* 133 Cal. 196 [65 P. 395], held that the question involved in litigation of this sort was whether the Legislature had, in prescribing an oath, gone "beyond the intent, object and meaning of the Constitution" and whether the Legislature had prescribed an oath or test substantially different from that prescribed by the Constitution. As I have heretofore pointed out, the Levering Act provision relating to past affiliations *at least* goes far beyond the intent, object and meaning of the Constitution. It cannot then be said, with a clear conscience, that the two oaths are substantially similar inasmuch as the Constitution in this respect speaks only of the present and the future. It cannot be denied that the two Constitutions are the supreme law of the state and of the United States and, as said by John Marshall, the greatest Chief Justice this country has ever known: "Those, then, who controvert the principle that the constitution is to be considered, in court, as a paramount law, are reduced to the necessity of maintaining that courts must close their eyes on the constitution, and see only the law.

"This doctrine would subvert the very foundation of all written constitutions. It would declare that an act which, according to the principles and theory of our government, is entirely void, is yet, in practice, completely obligatory. . . . [Such doctrine cannot be tolerated under the Constitution.] It is apparent, that the framers of the constitution contemplated that instrument as a rule for the government of courts, as well as of the legislature.

"Why otherwise does it [the Constitution] direct the judges to take an oath to support it? This oath certainly applies in an especial manner, to their conduct in their official character. How immoral to impose it on them, if they were to be used

as the instruments, and the knowing instruments, for violating what they swear to support!'' (*Marbury* v. *Madison*, 1 Cranch 137, 178-180.)

The above quoted language of Chief Justice Marshall applies with equal force to the evasion practiced by this court in subverting the clear mandate of this provision of the Constitution to the additional requirements imposed by the Levering Act.

The principle here involved is of tremendous importance to those who believe in preserving the constitutional guarantees of fundamental civil liberties. These constitutional guarantees were written in the light of bitter experiences arising out of the exercise of arbitrary power or usurpation of power by the legislative or executive branch of the government. Constitutions were written to protect the individual against the exercise of such arbitrary power. The lessons of history reveal that at various times under the stress of inflamed public opinion both the Legislature and the Executive have attempted to circumvent constitutional restrictions by adopting measures which seemed expedient in view of the exigencies of the situation at hand. In my opinion the Levering Act is such a measure. I think it is apparent from the language of the act that its proponents believed that the Legislature had the power to prescribe a different oath for all employees of the state except the constitutional officers, and that it was under this mistaken belief that the act was adopted. Now that this court has held that the constitutional prohibition against any other oath, declaration or test applies to every state and local officer and employee, the Levering Act which was designed to apply to all employees of the state except constitutional officers, should fall.

To my mind it is too plain to permit of argument that it was the intention of the framers of the Constitution that ''no other oath, declaration or test'' should ever be required of any public officer or employee of the state or any of its political subdivisions than that specifically provided for in article XX, section 3 of the Constitution. The action taken at the constitutional conventions clearly demonstrates the correctness of this position. The defeat of proposed amendments which sought to enlarge the scope of the oath, the failure to confer upon the Legislature power to do anything other than *exempt* such inferior officers as it saw fit from taking the prescribed oath and the specific prohibition against re-

quiring any "other oath, declaration or test . . . as a qualification for any office or public trust," makes it crystal clear that the framers of the Constitution intended to prevent just what the Levering Act is designed to accomplish. In other words they sought to limit and define the power of the Legislature in what history had revealed to be a most controversial field. Such being the obvious and unmistakable intention of the framers of the Constitution, the language of Chief Justice Marshall in *Marbury* v. *Madison, supra,* is particularly pertinent: ". . . [T]he powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the Constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time be passed by those intended to be restrained? *It is a proposition too plain to be contested, that the Constitution controls any legislative act repugnant to it; or, that the legislature may alter the Constitution by an ordinary act.* Between these two alternatives there is no middle ground. The Constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative act, and, like other acts, is alterable when the legislature shall please to alter it. . . . If an act of the legislature, repugnant to the Constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect? *It is emphatically the privilege and duty of the judicial department to say what the law is.* . . . So, if a law be in opposition to the Constitution; if both the law and the Constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the Constitution, or conformably to the Constitution, disregarding the law; the court must determine which of these conflicting rules shall govern the case. This is of the very essence of judicial duty.''

But the majority of this court by its decisions in these cases is forsaking its sworn duty to support the Constitution of the State of California, and has abdicated its power, for the sake of expediency, to uphold an act which invades the constitutional guarantees of civil liberties of those affected by its mandates.

There is no question of loyalty involved in any of these cases. So far as appears from the records before us every employee here involved was fully investigated and there is no suggestion of any conduct even bordering on subversive

activity on the part of any of them. They have merely sought to stand on their constitutional right to take the one and only oath which the Constitution prescribed. On this stand I unqualifiedly join them.

I would, therefore, grant the writ prayed for and restore petitioner to his position.

Petitioner's application for a rehearing was denied November 14, 1952. Carter, J., was of the opinion that the petition should be granted.