**Halldora Kristin SIGURDSON,
Appellant,**

v.

**H. R. LANDON, Albert Del Guercio and
Henry Grattan, Appellees.**

**No. 13974.**

United States Court of Appeals
Ninth Circuit.

Sept. 7, 1954.

Rehearing Denied Oct. 27, 1954.

John P. Tobin, Los Angeles, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., Clyde C. Downing, Walter M. Lehman, Los Angeles, Cal., Max Deutz, Andrew J. Weisz, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before DENMAN, Chief Judge, and HEALY and POPE, Circuit Judges.

POPE, Circuit Judge.

The appellant, a native and national of Canada, first came to the United States in 1944. In July, 1949, she took a vacation in Mexico. On October 10, 1951, a warrant was issued for the arrest of the appellant for deportation, it being charged that prior to her reentry, following the vacation in Mexico, she had been a member of or affiliated with the Communist Party of the United States, and hence that she was subject to deportation pursuant to the provisions of the Internal Security Act of 1950, Ch. 1024, 81st Cong. 2nd Session, 64 Stat. 987, 1006.[1]

Administrative hearings upon the warrant were commenced October 24, 1951 and continued from time to time thereafter and concluded on February 20,

[1] Section 22 of that Act lists as persons to be excluded from admission to the United States aliens "who are members of or affiliated with (i) the Communist Party of the United States * * *." The section also provides: "Any alien who was at the time of entering the United States, or has been at any time thereafter * * * a member of any one of the classes of aliens enumerated [in the section above quoted] shall, upon the warrant of the Attorney General, be taken into custody and deported in the manner provided in the Immigration Act of February 5, 1917."

1952. At such hearings the appellant was present and represented by counsel. The hearing officer made findings and a decision that appellant was a voluntary member of the Communist Party of the United States for a period of time during the years 1946–1947, and concluded that she was subject to deportation and recommended that she be ordered deported. His findings and decision were approved and adopted by the appropriate officer of the Immigration and Naturalization Service and appellant's appeal therefrom was dismissed by the Board of Immigration Appeals on March 19, 1953, and a final warrant or order of deportation issued March 30, 1953.[2] Appellant filed her petition for a writ of habeas corpus in the court below and this appeal is from the judgment of that court dismissing that petition upon the merits.

Upon this appeal petitioner challenges the sufficiency of the evidence to sustain deportation under the Internal Security Act of 1950, attacks the validity of the Act as applied to her, and asserts that for sundry reasons the administrative proceedings were so lacking in fairness as to be wanting in due process of law.

The evidence upon which the administrative finding of membership in the Communist Party of the United States was based consisted of (a) certain admissions upon the part of the appellant, and (b) the testimony of two witnesses who testified before the hearing officer. The admissions which were offered in evidence were statements alleged to have been made by the appellant to certain investigating officers in the month of November, 1950, and prior to the issuance of the warrant for her arrest. The written transcript of the statement discloses that the appellant then stated that she was a member of the Communist Party of the United States for a period of approximately one year during which she was associated with the John Reed Club of the University of Southern California; that she was aware that this Club was a Communist Party group, and that this occurred in 1946 and 1947.[3]

Before the hearing officer the appellant challenged the admissibility of the

2. Upon that date the Immigration and Nationality Act of June 27, 1952, 66 Stat. 166, had been enacted but section 405 of that Act contained a savings clause providing that deportation proceedings then pending should not be affected by the enactment of the Act of June 27, 1952. See note to 8 U.S.C.A. § 1101.

3. During the early portion of this examination appellant appears to have been somewhat evasive. For example, in telling of her membership in a group later identified as the John Reed Club, she called it a "study club". The interrogation proceeded: "Q. Are you aware of the existence of an organization known as the 'John Reed Club'? A. No, not as such.

"Q. Did you ever hear of the organization of the John Reed Club? A. I don't really know whether I do recall if there's a John Reed Club or a club called the John Reed Club, no.

"Q. Is the name totally foreign to you? A. No, it isn't.

"Q. Did you become aware of the existence of a John Reed Club while you were a student at USC? A. I might have, yes.

"Q. Was the study club that you referred to in which you state you held membership known as the John Reed Club? A. I don't recall it being or not being the John Reed Club.

"Q. Are you willing to state now that your study club was called the John Reed Club or not? A. I'm certainly willing to state that it certainly could have been the John Reed Club. I don't remember as having a name during the time I was identified with the club." Finally, she answered as follows: "Q. Would you state then that you were a member of the Communist Party of the United States for a period of approximately one year? A. Yes, approximately one year or less.

"Q. Do you feel that your membership was exclusively during the period that you was associated with this study group which we have referred to as the John Reed Club? A. Yes, I do. * * *

"Q. When did you become aware that this group was, in fact, a Communist Party group? A. Well * * * I think I * * * I think I was suspicious rather early.

"Q. When did your suspicions crystallize into knowledge? A. I don't * * * I can't state any particular date. I guess I would say some time before I ceased association."

offered proof of these admissions. She testified that she had been examined on that occasion in a hot room where the temperature was 91°, where the windows were closed and where the examining officers so filled the room with tobacco smoke that she was subject to extreme physical and mental discomfort; that during the recording of her examination there were many off-the-record interruptions when the officers said: "Oh, you know better", "don't try to tell us that", "oh you are being evasive", "you are engaging in mental fencing", and the like; so that anything she said on that occasion was under some sort of psychological coercion.[4] The statements made on that occasion were recorded upon a dictaphone and the offered transcript of what was said on that occasion was transcribed from the dictaphone belts. Counsel for appellant asserted before the hearing officer that the offered transcript was incorrect and not a true record of what had been said. For the purpose of checking the accuracy of the transcript the dictaphone belts were produced and replayed before the hearing officer. These were identified as the records made during appellant's examination by the investigating officers.

Counsel for the appellant and counsel for the Government followed the offered transcript as the dictaphone record was replayed and when they were asked if the transcript was correct according to the recordings, appellant's counsel replied: "Substantially so. Substantially so with the recordings; there were certain minor corrections but we won't worry about that." .

Appellant apparently contends that notwithstanding it was thus conceded that the dictaphone record and the offered transcript of her statement were substantially identical that the dictaphone record thus played in the presence of the hearing officer must have been a spurious one. Appellant testified that during the replaying of the record before the hearing officer, a process which required two hours and 20 minutes, there was but one audible "click" from the record. It was testified not only by the appellant but by the officers who took the statement, that the dictaphone machine was stopped on numerous occasions during the taking of the statement. It is asserted that had this been the actual dictaphone record of appellant's examination and not a substituted one, there would have been a "click" audible for each time that the machine was thus stopped.[5]

It is sufficient to say that all of these claims of fabrication and substitution

---

4. She testified: "Q. Miss Sigurdson, you stated that you were frightened by the officers who took the statement; did they threaten you with physical harm, bodily harm, if you did not make such a statement? A. No, they didn't.

"Q. In what manner were you frightened? A. In what manner?

"Q. How were you frightened? A. You mean what in their manner frightened me?

"Q. You stated you were frightened; will you please explain? A. I was frightened by their entire manner in which they conducted themselves, the sound of their voices, the belligerency, the demanding, the commanding type of behavior that was expressed.

"Q. What did you fear? A. I wondered at what point they might use physical violence.

"Q. Did they threaten to incarcerate you or deport you from the United States

if you did not make certain answers? A. No. I don't recall that they did that."

Asked if she had then answered in the affirmative the following question: "Are you now or have you ever been a member of the Communist Party of the United States?", she testified as follows: "Q. Did you say 'yes' to the question? A. That came out of my mouth, yes, it did; it was not voluntary or free or my own statement in that sense.

"Q. Were they forcing you at that time to say that, did they tell you to say yes? A. They did."

5. Before the hearing officer there was no proof to this effect, and no proper offer of such proof. What happened was that appellant's counsel said: "I have been to the Dictaphone people and they appraised me * * * that the belts should absolutely reveal when the machine was shut off. * * * I want permission to take these belts to the Dictaphone people

were made before the hearing officer who had an opportunity to compare the voice and manner of speech disclosed in the dictaphone records with the voice and manner of speech of the appellant, whom he had heard in person, and he rejected the assertion that the recordings were not those of appellant's examination on November 2.[6]

The Government produced two witnesses who testified before the hearing officer that they had been members of the John Reed Club and of the Communist Party at the same time that appellant was a member. They testified that they had then been acquainted with her, attending meetings of this group with her, and that she could not have joined or have been a member of this Club without knowing that it was a unit of the Communist Party of the United States.

Appellant contended before the hearing officer and undertakes to argue here, that the testimony given by these witnesses was so unworthy of belief that it must be regarded as a complete nullity. One of the witnesses, a John Kerr, testified that in 1950, after he had ceased his Communist Party membership, he signed the "California Loyalty Oath."[7] Appellant says that because that oath contained a statement that "within the five years immediately preceding * * * I have not been a member of any party or organization" advocating the overthrow of the Government of the United States by force or violence, Kerr was shown to have been guilty of perjury in

signing the oath. Therefore, says appellant, the hearing officer was obliged wholly to disregard all of Kerr's testimony.

Another of these witnesses, Tony Harry Adrean, testified that he had been a professional expert witness on Communism. Pointing to this portion of his testimony and to certain discrepancies between the testimony of Adrean and that of Kerr, particularly with respect to street addresses where the John Reed Club was said to have met, appellant argues that the testimony of Adrean likewise is no evidence at all and that the hearing officer was obliged to disregard it.

With respect to all these attacks upon the sufficiency of the evidence to sustain the administrative finding of Communist Party membership, it is enough to say that the hearing officer gave careful consideration to all of the questions thus raised by the appellant and found upon the evidence before him that the appellant had in fact on November 2, 1950, made the statements attributed to her; that those statements had not been obtained by duress or coercion, but had been made voluntarily; and that the record of such statements produced and identified by the officers who took them was correct and accurate. After listening to the playing back of the dictaphone recordings and of the sound of the voices there recorded, and the manner in which the questions and answers were propounded and given, he found that the admissions charged to the appellant were

so I can get a report whether or not there has been any tampering with these belts or whether this is a playback in plain English." Appellant was the only witness who testified that on the playback but one "click" was audible. Before the court counsel said: "The Dictaphone representatives * * * would have testified the machine in vogue, and, which they sold to the Immigration Service in 1950 was such and such a type that didn't have that type of contrivance on it which would have a click".

6. Five dictaphone belt recordings were replayed during this process of comparing them with the typewritten transcript. The record indicates that the investigat-

ing officers had three additional dictaphone belt recordings and these additional records were not examined by the hearing officer. Appellant asserts that this was further proof that there was some sort of fabrication. The record fails to disclose that the additional unused recordings were material or that they had any significance with relation to the question whether the appellant had in fact made the admissions charged to her.

7. See Pockman v. Leonard, 39 Cal.2d 676, 249 P.2d 267, which sets out the oath required under the Act, Deering's Government Code Cal. § 3100, 1951 Stats.Cal. p. 15.

in fact made by her and were in all respects freely and voluntarily made.

■ With respect to the asserted perjury on the part of witness Kerr, the hearing officer thought that there was no proof that when Kerr signed the loyalty oath he knew or was aware that the Communist Party was an organization whose purpose was to overthrow the government of the United States by force or violence. But whether the hearing officer was or was not justified in this thought, or in thus excusing the signing of the oath, the question before him was whether Kerr was now, at the hearing, telling the truth, or was to be believed. The hearing officer saw and observed the two witnesses. It was for him, not for us or for the trial judge, to say whether their testimony, then given in his presence, should be credited.

It must be conceded, however, that if the trial judge were called upon to base findings upon the testimony of witnesses of the type here called, he might have declined to do so. And it may well be that hereafter when Congress comes to review the administration of this Act and the Department's practice of using professional, so-called expert witnesses on Communism, it may not be particularly proud of the results accomplished. What we here point out is that it is not within the functions or power of this court to do anything about such matters.

■ Appellant seems to concede that upon the hearing by the court it was no part of the court's function to review the evidence received by the hearing officer or considered in the administrative proceeding for the purpose of determining whether he agreed with the hearing officer as to which witnesses were to be believed or as to whether wrong inferences were drawn from the evidence.[8] Her briefs recognize the rule stated in Eagles v. U. S. ex rel. Samuels,

329 U.S. 304, 311, 67 S.Ct. 313, 317, 91 L.Ed. 308, to the effect that: "It is elementary that habeas corpus may not be used as a writ of error. Tisi v. Tod, 264 U.S. 131, 44 S.Ct. 260, 68 L.Ed. 590; Woolsey v. Best, 299 U.S. 1, 57 S.Ct. 2, 81 L.Ed. 3. The function of habeas corpus is exhausted when it is ascertained that the agency under whose order the petitioner is being held had jurisdiction to act. If the writ is to issue, mere error in the proceeding which resulted in the detention is not sufficient. Tisi v. Tod, supra. Deprivation of petitioner of basic and fundamental procedural safeguards, an assertion of power to act beyond the authority granted the agency, and action without evidence to support its order, are familiar examples of the showing which is necessary. See Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Bridges v. Wixon, 326 U.S. 135, 149, 65 S.Ct. 1443, 1450, 89 L.Ed. 2103. But it is not enough to show that the decision was wrong. Tisi v. Tod, supra, or that incompetent evidence was admitted and considered. U. S. ex rel. Vajtauer v. Commissioner, 273 U. S. 103, 47 S.Ct. 302, 71 L.Ed. 560. If it cannot be said that there were procedural irregularities of such a nature or magnitude as to render the hearing unfair, Bridges v. Wixon, supra, at page 156 of 326 U.S., at page 1453 of 65 S.Ct., 89 L.Ed. 2103, or that there was no evidence to support the order, U. S. ex rel. Vajtauer v. Commissioner, supra, the inquiry is at an end."[9]

■ Appellant's position appears to be that these rulings of the hearing officer with respect to the admissibility of offered evidence, and his findings with respect to the appellant's membership in the Communist Party were so outrageous as to constitute a denial of due process and a depriving of the appellant of

8. At the hearing below the following occurred: "The Court: * * * 'As I understand these matters, this order to show cause for the writ of habeas corpus will involve a review by the court of this administrative file. It will not involve the taking of any other testimony. Do you agree with that? Mr. Tobin: Yes, your Honor'."

9. Tisi v. Tod, there cited, was also a deportation proceeding.

basic and fundamental procedural safeguards.

With respect to that contention we can only say that we cannot agree. In our view the trial court could not have reached any different conclusion than that disclosed by the judgment against the appellant.

■■ Appellant assigns some other errors most of which are so lacking in definiteness and specificity that it is difficult to understand what points she is attempting to make.[10] Appellant says that: "The court denied appellant right to prove spuriousness of the questioned evidence * * * to-wit: the dictaphone belts from which Exhibit 7 of Exhibit B was made." If this is an assertion that there was error on the part of the court in rejecting certain evidence offered by the appellant, we think that no such point can be made here for several reasons: If the appellant had such proof, the proper place to offer it was before the hearing officer. No such offer was made. (See footnote 5 supra.) Even if such an offer had been made and rejected, a wrong ruling in this respect would not require upsetting of the administrative decision under the rule stated in Eagles v. U. S. ex rel. Samuels, supra, and in Tisi v. Tod, supra. Furthermore, there is here no compliance with subdivision (d) of our Rule 18.[11]

It is contended that the decision of the court below must be reversed for the reason that it ruled without a full or adequate reading of the record before it. In substance appellant asserts that the trial court acted so precipitately in denying appellant's petition that its decision was an arbitrary one.

The record shows that the cause was set down for hearing on July 13, 1953. On that day all parties being present, counsel for appellant made a motion for the "immediate issuance of a writ of habeas corpus and the immediate order of discharge of petitioner". In support of this motion witnesses were called by appellant and examined. The appellant also made a motion for an order requiring an exhibit attached to the return to be added to or supplemented. These motions were denied after very extensive argument during which the state of the record before the Immigration Service was discussed at great length. Thereafter, and on the same day, the court announced that the petition would be dismissed. The case was recessed until the day following, July 14, on which day the appellant made a motion "of rehearing of decision denying our writ of habeas corpus". This was followed by a further extended argument between counsel with respect to the state of the record before the hearing officer and with respect to the merits of the petition. It was then stated by counsel for appellant that it was improbable that the court had read the transcript before it. The court then announced: "I will tell you what I am going to do. I will just read the record tomorrow. I will read the whole thing. I will read everything. I will rule on this about Friday." Upon Friday, the 15th of July, the argument as to the merits of the cause continued, and at the conclusion of that day's hearing the court directed that the record show "that after the proceedings had on July 13, 14 and 15, 1953, the court orders the order to show cause dismissed and the petition for habeas corpus denied."

10. For example: "That Findings V, VI and VII were made despite fact that record before court, particularly, Exhibit B, shows that hearing was in violation of multiplicity of sections of 8 Code of Federal Regulations and that Hearing Officer acted arbitrarily and contrary to established law, infra." "That Finding No. VIII was made despite showing of direct violation of many sections of 8 Code of Federal Regulations, all of which are set forth in the Argument, infra, being too numerous to mention repeatedly."

11. "(d) * * * When the error alleged is to the admission or rejection of evidence the specification shall quote the grounds urged at the trial for the objection and the full substance of the evidence admitted or rejected, and refer to the page number in the printed or typewritten transcript where the same may be found."

■ The record sufficiently shows that the district court gave full and adequate consideration to the record before it. It cannot be asserted here that the court acted arbitrarily in not spending enough time in considering the matters before it.

It is said by appellant that the respondents in the court below failed to certify in response to the order to show cause a complete record of all the proceedings before the Board of Immigration Appeals. It appears that after the appeal to the Board of Immigration Appeals was dismissed on March 19, 1953, the appellant on April 3, 1953 filed a motion for reconsideration of the Board's decision. Subsequently on May 27, 1953, she filed a supplemental motion for such reconsideration. On June 12, 1953, a written order denying such reconsideration was executed by the Board, and on June 26, 1953, a further order to the same effect was made by the Board. Both orders were attached to the original return, but on the application of the respondents and showing made by them that the June 12 order was only tentative and that the order of June 26 was the one intended by the Board finally to dispose of the motion for reconsideration, the court below made an order permitting the June 12 order to be filed as a separate exhibit but not as a part of the return. As both documents were but denials of the appeal, we are unable to see how this action of the court, whether right or wrong, could have been in any manner prejudicial to the appellant.

■ It is argued that the Act of September 27, 1950, 64 Stat. 1048, exempting immigration proceedings from the Administrative Procedure Act of 1946, is unconstitutional in that it is a violation of "due process and equal protection" clauses of the Constitution. We regard this assignment as so patently frivolous as to require no discussion here.

■ Finally, it is contended that Section 22 of the Internal Security Act of 1950 is "unconstitutional in that it is in violation of the Fifth Amendment of the Constitution". That contention was ruled without merit in Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 742.

■ It is altogether possible that the appellant was in no sense a conscious collaborator in the communist conspiracy against which the Act is directed. Rather, she may have been one of those persons with sympathy toward the underprivileged and a desire to fight against oppression of minority groups who were deceived into believing that these communist groups were genuinely interested in the same altruistic objectives. She may have been herself their victim. In the language of the Galvan case, she may be "an alien who was duped into joining the Communist Party". In Harisiades v. Shaughnessy, 342 U.S. 580, 72 S.Ct. 512, 518, 96 L.Ed. 586 the court noted that the Act there considered was one which "bristles with severities"; and in Galvan, the feature of the Act here considered was said to be one that "strikes one with a sense of harsh incongruity". But Congress was not obliged to require the administrative officials, or the courts, to attempt the impossible task of determining whether an alien is an innocent dupe or a dissembling hypocrite. Congress drew no distinction, and we cannot. This was settled by Galvan v. Press.

The judgment is affirmed.