[Sac. No. 6530. In Bank. July 5, 1955.]

HARRY C. STEINMETZ, Petitioner, v. CALIFORNIA STATE BOARD OF EDUCATION et al., Respondents.

Wirin, Rissman & Okrand, A. L. Wirin and Fred Okrand for Petitioner.

Edmund G. Brown, Attorney General, and Richard L. Mayers, Deputy Attorney General, for Respondents.

GIBSON, C. J.—Petitioner was dismissed from his position as an associate professor at San Diego State College because of his refusal, at a hearing before the State Board of Education, to answer two questions as to whether he was or had been a member of the Communist Party, and he seeks a writ of mandate to compel his reinstatement.

The state board acted pursuant to section 1028.1 of the Government Code, which is part of a statute commonly known as the Luckel Act. Section 1028.1 provides that it shall be the duty of any public employee, when ordered to do so, to appear before the governing body of the state or local agency by which he is employed and to answer under oath questions relating to:

"(a) Present personal advocacy by the employee of the forceful or violent overthrow of the Government of the United States or of any state.

"(b) Present knowing membership in any organization now advocating the forceful or violent overthrow of the Government of the United States or of any state.

"(c) Past knowing membership at any time since September 10, 1948, in any organization which, to the knowledge of such employee, during the time of the employee's membership advocated the forceful or violent overthrow of the Government of the United States or of any state.

"(d) Questions as to present knowing membership of such employee in the Communist Party or as to past knowing membership in the Communist Party at any time since September 10, 1948."

The section further provides that "Any employee who fails or refuses to appear or to answer under oath on any ground whatsoever any such questions so propounded shall be guilty of insubordination and guilty of violating this section and shall be suspended and dismissed from his employment in the manner provided by law."

At the hearing petitioner was examined by William Blair, president of the State Board of Education, as follows:

MR. BLAIR: . . . Are you knowingly a member of the Communist Party?

DR. STEINMETZ: Mr. Chairman. I am sorry, but I find it necessary to refuse to answer this question as I would if you asked me if I were a member of any other party because I do not believe that there is authority in the act under which you are proceeding for asking such a question.

MR. BLAIR: . . . Have you at any time since September 10, 1948, knowingly been a member of the Communist Party?

DR. STEINMETZ: In all good conscience I must give you exactly the same answer now that I gave you a moment ago, sir.

MR. BLAIR: That is, that you decline to answer.

DR. STEINMETZ: Yes, sir.

MR. BLAIR: . . . Do you know whether or not the Communist Party advocates the forceful or violent overthrow of the government of the United States or of any state?

.    .    .    .    .    .    .    .    .    .    .

DR. STEINMETZ: Mr. Blair, I have no such knowledge.

.    .    .    .    .    .    .    .    .    .    .

MR. BLAIR: Have you at any time since September 10,

1948, to and including today, knowingly been a member of the Communist Party when, to your knowledge, it advocated the forceful or violent overthrow of the government of the United States or of any state?

DR. STEINMETZ: Mr. Blair. I have in part answered this question when I disclaimed knowledge. I should like further to answer it by saying that I have never in my life, now, in the past, and so long as I would be a state employee, would never belong to an organization that advocated force and violence against the United States, this state, or any subdivision thereof. I took an oath, the Levering Act oath, and signed it honestly, . . . [Here petitioner recited in substance, the Levering oath, Gov. Code, § 3103.]

MR. BLAIR: That was intended to be an answer to the question "Have you at any time since September 10, 1948, to and including today, knowingly been a member of the Communist Party when to your knowledge it advocated the forceful or violent overthrow of the government of the United States or of any state?" What would be your answer directly to that question, Dr. Steinmetz?

DR. STEINMETZ: Mr. Blair, in part I answered that when I disclaimed knowledge, and in further part I have just answered it by reaffirming the Levering Act oath.

MR. BLAIR: I have repeated the question and I would feel obliged to direct you to answer it "yes" or "no" or "I refuse to answer." After that you may explain your answer, if you have not already explained it.

.     .     .     .     .     .     .     .     .     .

DR. STEINMETZ: May I say that I have answered a question with regard to membership by saying that I would not answer any question with regard to membership, and that was very straightforward, and I have answered a question with regard to knowledge by disclaiming that I had the knowledge, and I have answered a question with regard to advocacy with an emphatic "No."

MR. BLAIR: Your "no" applies to what part of the question?

DR. STEINMETZ: To my advocacy, and to my knowledge, and to membership with knowledge.

MR. BLAIR: These questions were all framed in the belief that they could be in all fairness answered "yes" or "no."

DR. STEINMETZ: You consider a question like that fair, Mr. Blair?

MR. BLAIR: It seems that it simply wishes to inquire

whether you have knowingly been a member of the Communist Party when to your knowledge it advocated the forceful and violent overthrow of the government. Now can you answer that by—you can answer that by "yes" or "no" or by refusal to answer it. If you take objection to the form of it you can refuse to answer.

DR. STEINMETZ: Under protest in principle on account of my belief with my attorney that this is a duplicitous question, pressed as I feel I am, I answer it then "no."

MR. BLAIR: . . . Do you presently advocate the forceful or violent overthrow of the government of the United States or of the government of any state of the United States?

DR. STEINMETZ: Mr. Blair, as a teacher and a free American, I trust, who distinguishes between incitement and advocacy, I like no question pertaining to advocacy, but I have already answered it "no," and therefore, of course, answer it the same way now.

MR. BLAIR: . . . Are you knowingly a member of any organization which to your knowledge now advocates the forceful or violent overthrow of the government of the United States or of the government of any state of the United States?

DR. STEINMETZ: No, sir. . . .

. . . . . . . . . .

MR. BLAIR: Have you at any time since September 10, 1948, knowingly been a member of any organization which to your then knowledge advocated during the time of your membership the forceful or violent overthrow of the government of the United States or of the government of any state of the United States?

. . . . . . . . . .

DR. STEINMETZ: . . . I should like to answer the last question with a very decided "no."

The foregoing shows that, although petitioner answered questions asked under subdivisions (a), (b) and (c) of section 1028.1 relating to his personal advocacy of violent overthrow of the government and his membership in organizations advocating violent overthrow of the government, he refused to answer two questions asked under subdivision (d), namely, (1) "Are you knowingly a member of the Communist Party?" and (2) "Have you at any time since September 10, 1948, knowingly been a member of the Communist Party?" His discharge was based upon this refusal.

Petitioner argues that, in effect, he answered the questions as to whether he was knowingly a member of the Com-

munist Party when, at a later point in the examination, he replied to the inquiry as to knowing membership in the party with knowledge of its objectives. However, he refused to answer inquiries which omitted the qualification of knowledge of the nature of the organization and were directed only to knowledge of membership. The word "knowingly" as used in the questions which he declined to answer did not refer to knowledge of the aims of the party but merely to whether he knew that he was a member, and it is clear from the record that he so understood the word at the time he refused to answer. In a memorandum submitted to the board at the beginning of the hearing, petitioner stated, "The use of the phrase 'knowing membership in the Communist Party' does not vitiate the vice of the statute. This is so because the Legislature has made it clear that the 'knowing' refers to knowing one is a member of the Party rather than as to the knowledge of the one being questioned as to the subversive nature of the Party. . . . In other words, the statute plainly states that knowledge of the improper nature of the Communist Party is not an ingredient." Petitioner also showed that he so understood the questions when he said, "I have answered a question with regard to membership by saying that I would not answer any question with regard to membership . . . and I answered a question with regard to knowledge by disclaiming that I had the knowledge. . . ."

Section 1028.1, considered as a whole, shows on its face that the Legislature, in using the words "knowing membership," was referring to a person's knowledge of his membership, rather than to his knowledge of the character of the organization. In subdivision (c), when the Legislature intended to specify knowledge of the nature of the organization, as well as knowledge of the fact of membership, it explicitly referred to "knowing membership" in an organization which "to the knowledge of such employee . . . advocated" violent overthrow of the government. In the next subdivision, on the other hand, when the Legislature spoke of "knowing membership" without mention of knowledge of advocacy, it obviously was referring only to the fact of membership and not to knowledge of the nature of the organization. The choice of language was clearly deliberate, and in both subdivisions the words "knowing membership" were used in the same sense of knowledge of the fact of membership.

It thus was proper, under the terms of subdivision (d), to question petitioner as to the fact of membership without reference to his knowledge of the character of the organiza-

tion, and the questions on this point which he refused to answer were not covered by his denials that he was knowingly a member with knowledge of the nature of the party.

■ The statute under which petitioner was dismissed is not rendered invalid by the fact that it requires an employee to answer questions as to his membership in the Communist Party without regard to his knowledge of the nature of the party. Petitioner's discharge was not because of membership in a proscribed organization but because of his refusal to answer questions as to whether or not he held membership in the Communist Party. ■ A governmental body may, of course, make reasonable inquiries into matters pertaining to the fitness of its employees. ■ Loyalty on the part of those in public employment is important to orderly and dependable government and is, therefore, relevant to fitness for such employment. (*Pockman* v. *Leonard,* 39 Cal.2d 676, 687 [249 P.2d 267].) ■ An employee's associates, as well as his conduct, are factors which may be considered by a state agency in determining his loyalty, and information on that subject may properly be elicited from him. (*Adler* v. *Board of Education,* 342 U.S. 485, 492-493 [72 S.Ct. 380, 96 L.Ed. 517, 27 A.L.R. 472] ; *Pockman* v. *Leonard,* 39 Cal.2d 676, 685-687 [249 P.2d 267].)[1] In this connection, it has been held that a public employer may constitutionally require its employees to disclose any past or present membership in the Communist Party. (*Garner* v. *Board of Public Works,* 341 U.S. 716, 720 [71 S.Ct. 909, 95 L.Ed. 1317].)[2]

■ Statutes, such as the one involved here, which compel disclosure of information concerning a public employee's

[1]In the Adler case it was said: ''One's associates, past and present, as well as one's conduct, may properly be considered in determining fitness and loyalty. From time immemorial, one's reputation has been determined in part by the company he keeps. In the employment of officials and teachers of the school system, the state may very properly inquire into the company they keep, and we know of no rule, constitutional or otherwise, that prevents the state, when determining the fitness and loyalty of such persons, from considering the organizations and persons with whom they associate.''

[2]In the Garner case, after stating that the issue was whether a city ''is constitutionally forbidden to require that its employees disclose their past or present membership in the Communist Party,'' it was said: ''We think that a municipal employer is not disabled because it is an agency of ·the State from inquiring of its employees as to matters that may prove relevant to their fitness and suitability for the public service. Past conduct may well relate to present fitness; past loyalty may have a reasonable relationship to present and future trust. Both are commonly inquired into in determining fitness for both high and low positions in private industry and are not less relevant in public employment.''

membership in proscribed organizations, must be distinguished from those which provide for discharge or disqualification because of membership or refusal to take an oath denying membership. Under the latter type of statute, knowledge of the character of the organizations has been held essential (*Wieman* v. *Updegraff*, 344 U.S. 183 [73 S.Ct. 215, 97 L.Ed. 216]), and the legislation has been sustained only when it expressly or impliedly required such knowledge (*Adler* v. *Board of Education*, 342 U.S. 485, 494 [72 S.Ct. 380, 96 L.Ed. 517, 27 A.L.R.2d 472]; *Garner* v. *Board of Public Works*, 341 U.S. 716, 723-724 [71 S.Ct. 909, 95 L.Ed. 1317]; *Gerende* v. *Baltimore City Board of Supervisors of Elections*, 341 U.S. 56, 57 [71 S.Ct. 565, 95 L.Ed. 745]; *Pockman* v. *Leonard*, 39 Cal.2d 676, 685 [249 P.2d 267]; *Hirschman* v. *County of Los Angeles*, 39 Cal.2d 698, 702 [249 P.2d 287, 250 P.2d 145]). ■ On the other hand, where the statutes provide merely for the disclosure of information, a requirement that the employee have knowledge of the nature of the organizations is not necessary. (See *Garner* v. *Board of Public Works*, 341 U.S. 716, 719-720 [71 S.Ct. 909, 95 L.Ed. 1317]; *Adler* v. *Board of Education*, 342 U.S. 485, 492-493 [72 S.Ct. 380, 27 A.L.R.2d 472].)

■ Petitioner's refusal to answer was not based upon a claim of privilege against self-incrimination under the Fifth Amendment to the federal Constitution or section 13 of article I of the state Constitution, and, accordingly, he is precluded from relying on these constitutional provisions. ■ It is settled that a witness is required to claim this privilege, that it is a purely personal privilege, solely for the benefit of the witness and that it is deemed waived unless invoked. (*Rogers* v. *United States*, 340 U.S. 367, 370-371 [71 S.Ct. 438, 95 L.Ed. 344, 19 A.L.R.2d 378].) ■ Moreover, a person may properly be required to disclose information relevant to fitness and loyalty as a reasonable condition for obtaining or retaining public employment, even though the disclosure, under some circumstances, may amount to self-incrimination. (*Pockman* v. *Leonard*, 39 Cal.2d 676, 687 [249 P.2d 267]; *Christal* v. *Police Com.*, 33 Cal.App.2d 564, 567 *et seq.* [92 P.2d 416]; cf. *Garner* v. *Board of Public Works*, 341 U.S. 716, 719-720 [71 S.Ct. 909, 95 L.Ed. 1317]; *Adler* v. *Board of Education*, 342 U.S. 485, 492-493 [72 S.Ct. 380, 96 L.Ed. 517, 27 A.L.R.2d 472].) ■ A public employee, of course, cannot be forced to give an answer which may tend to incriminate him, but he may be required to

choose between disclosing information and losing his employment.

Section 1028.1 does not violate the provision of the California Constitution which prohibits the passage of special laws in certain enumerated cases and ''in all other cases where a general law can be made applicable.'' (See Cal. Const., art. IV, § 25, subds. 1-33.) This section does not fall within any of the enumerated categories, and, insofar as any of its provisions are specific, no general law could have been made applicable. The Legislature, desiring to authorize inquiry as to membership in the Communist Party, could do so only by naming it. The designation of that organization was not arbitrary, but was reasonably related to the purpose of the legislation, since, as we have seen, information as to membership in the party is pertinent to fitness for public employment. The case of *Communist Party* v. *Peek*, 20 Cal.2d 536 [127 P.2d 889], is readily distinguishable. The statute there held invalid denied the Communist Party a place on the ballot, and regulation of elections is listed in the Constitution as one of the areas where a special law is prohibited. (Cal. Const., art. IV, § 25, subd. 11.) The basis of the decision in that case was that, in the absence of evidence, the court would be required to take· judicial notice of the subversive character of the Communist Party in order to uphold the statute as reasonable and that judicial notice to that effect could not be taken under the conditions then existing.

We need not determine whether there is any merit in petitioner's attack upon another section of the Luckel Act which provides that it shall be sufficient cause for dismissal when a public employee advocates, or is knowingly a member of the Communist Party or of an organization which during the time of his membership he knows advocates, the overthrow of the government by force or violence. (Gov. Code, § 1028.) As we have seen, petitioner was not dismissed because of membership in any organization but because of his refusal to answer questions concerning matters which were relevant to his fitness for public employment.

The writ is denied.

Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

It is my considered opinion that section 1028.1 of the

Government Code of California is unconstitutional because it denies to public employees the fundamental rights and liberties guaranteed to them by the Fifth Amendment to the Constitution of the United States and article I, section 13, of the Constitution of California. Even if one should be so caught up in the hysteria of our times that he fails to perceive the intrinsic unconstitutionality of this statute, he still must recognize the fact that the decision of the majority of this court in this case is erroneous under the rules announced in many recent cases decided by this court and by the Supreme Court of the United States.

In my opinion Dr. Steinmetz was wrongfully discharged and is therefore entitled to be reinstated. This conclusion may be reached by either of two lines of reasoning: (1) That Dr. Steinmetz answered all of the questions asked of him by the board, and therefore did not violate the provisions of Government Code, section 1028.1; or, (2) that Dr. Steinmetz refused to answer two of the questions put to him, but the board had no authority to ask those questions because the statute under which they acted was unconstitutional. (*Wieman* v. *Updegraff*, 344 U.S. 183 [73 S.Ct. 215, 97 L.Ed. 216]; *Pockman* v. *Leonard*, 39 Cal.2d 676 [249 P.2d 267]; *Hirschman* v. *County of Los Angeles*, 39 Cal.2d 698 [249 P.2d 287, 250 P.2d 145].)

The arguments opposed to the majority decision in this case are like a Roman gladiator's trident. The central point is that the statute is an abridgement of the constitutionally guaranteed privilege not to testify against oneself. The two auxiliary points are: (1) That there was no violation of the statute, or (2) that the statute is an arbitrary deprivation of due process, and is, therefore, unconstitutional under the holding in the Wieman, Pockman and Hirschman cases. In reaching its erroneous conclusion the majority has necessarily impaled itself on one or more of these points.

The first contention made by Dr. Steinmetz in his petition for a writ of mandate is that he did not violate Government Code, section 1028.1, and that his discharge for an alleged violation of that section was therefore unlawful. No contention is made that Dr. Steinmetz refused to answer any of the questions put to him except these two:

(1) "Are you knowingly a member of the Communist Party?"

(2) "Have you at any time since September 10, 1948, knowingly been a member of the Communist Party?"

The record shows that Dr. Steinmetz answered, "No" when asked: "Have you at any time since September 10, 1948, to and including today, knowingly been a member of the Communist Party when, to your knowledge, it advocated the forceful or violent overthrow of the Government of the United States?"

Dr. Steinmetz contends that the answer to this question constituted an answer to the two former questions.

It is clear either that the answer to the latter question did constitute an answer to the former questions, and that the majority opinion is incorrect in upholding his discharge; or that the State Board of Education had no authority to ask the two former questions because the statute authorizing those questions is unconstitutional. (*Wieman* v. *Updegraff, supra,* 344 U.S. 183; *Pockman* v. *Leonard, supra,* 39 Cal.2d 676; *Hirschman* v. *County of Los Angeles, supra,* 39 Cal.2d 698.)

The controversy centers around the meaning of the word "knowingly" as used in the statute and as used in the questions asked of Dr. Steinmetz. The majority opinion states that the word "knowingly," as used in the questions which Dr. Steinmetz purportedly refused to answer, ". . . did not refer to knowledge of the aims of the party but merely to whether he knew that he was a member. . . ."

Dr. Steinmetz contends that the word "knowingly" referred to knowledge of the pernicious nature of the Communist Party, and that he did, finally, answer (in the negative) the question as to membership in the party with knowledge of its nature.

In *Wieman* v. *Updegraff, supra,* 344 U.S. 183, the Supreme Court of the United States, by a unanimous decision, held that the due process clause of the Constitution of the United States was violated by inquiries as to the membership of state employees in certain organizations, *unless such inquiries referred to membership with knowledge of the activities and purposes of the organizations to which the employees belonged.* Classification of innocent membership with knowing membership was held to be arbitrary, unreasonable and unconstitutional.

Conversely, the United States Supreme Court has held (though not unanimously) that inquiry as to membership of an employee in the Communist Party, or in named subversive organizations, is permissible where expressly or assumedly the inquiry is as to membership with knowledge of the nature

and purpose of the organization. (*Gerende* v. *Baltimore City Board of Supervisors of Elections,* 341 U.S. 56 [71 S.Ct. 565, 95 L.Ed. 745] ; *Garner* v. *Board of Public Works,* 341 U.S. 716 [71 S.Ct. 909, 95 L.Ed. 1317] ; *Adler* v. *Board of Education,* 342 U.S. 485 [72 S.Ct. 380, 96 L.Ed. 517, 27 A.L.R.2d 472].)

In ruling on the constitutionality of California's Levering Act loyalty oath (Gov. Code, §§ 3100-3109) this court stated : "It should be noted at the outset that the oath provisions relating to membership can reasonably be construed as referring only to affiliation with organizations *known* by the employee to belong to the proscribed class, and each clause of the oath must be interpreted as requiring knowledge of the character of any group as to which a declaration is required." (*Pockman* v. *Leonard, supra,* 39 Cal.2d 676, 685.)

In *Hirschman* v. *County of Los Angeles, supra,* 39 Cal.2d 698, this court held that county employees could be required to disclose membership only in those organizations "which they knew advocated overthrow of the government by force, or which to their knowledge had been held by a court to advocate such action."

The Wieman, Gerende, Garner, Adler, Pockman and Hirschman cases were all decided and published before the passage by the California Legislature of the Luckel Act (in which is included Government Code, section 1028.1). The Legislature must be assumed to have had those cases before it, and to have considered them in drafting Government Code, section 1028.1. The word "knowing" as used in the statute, clearly must have been intended to mean "with knowledge of the nature and purposes of the Communist Party." If the word did bear this connotation, then Dr. Steinmetz clearly answered the disputed questions in the negative when he stated that he had not ". . . at any time since September 10, 1948, to and including today, knowingly been a member of the Communist Party when, to [his] knowledge, it advocated the forceful or violent overthrow of the government of the United States or of any state." It follows that the majority opinion, holding that Dr. Steinmetz did not answer the two questions, is erroneous.

If the word "knowing" as used in the statute and in the questions asked of Dr. Steinmetz, and as construed by the majority opinion in this case, meant only "with knowledge that he was a member," then (1) the statute is clearly unconstitutional (*Wieman* v. *Updegraff, supra,* 344 U.S. 183 ;

*Pockman* v. *Leonard, supra,* 39 Cal.2d 676; *Hirschman* v. *County of Los Angeles, supra,* 39 Cal.2d 698); (2) the State Board of Education had no authority to ask the questions; (3) Dr. Steinmetz was perfectly within his constitutional rights in refusing to answer the questions; and (4) the discharge of Dr. Steinmetz was wrongful.

The majority opinion concedes that knowledge of the character of the organization is essential in statutes ". . . which provide for discharge or disqualification because of membership or refusal to take an oath denying membership." Unlike the majority, I can find no substantial distinction between those statutes and the statute here considered. For refusal under oath to deny membership, the victim must be discharged under the terms of Government Code, section 1028.1. If he does answer, and his answers indicate membership in a proscribed organization, he may be discharged under the terms of the companion section, 1028.

My position on the right of the state to inquire into the private affairs of its citizens was made clear by my dissenting opinions in *Pockman* v. *Leonard, supra,* 39 Cal.2d 676; *Hirschman* v. *County of Los Angeles, supra,* 39 Cal.2d 698; *Tolman* v. *Underhill,* 39 Cal.2d 708 [249 P.2d 280]; *Bowen* v. *County of Los Angeles,* 39 Cal.2d 714 [249 P.2d 285]; and *Fraser* v. *University of California,* 39 Cal.2d 717 [249 P.2d 283]. I did not, at that time, believe that those cases were properly decided. I still believe that they are wrong. But right or wrong, those cases at least recognized a limit beyond which governmental inquiry into a citizen's associations and beliefs would be unreasonable. I believe that the limit set by that line of cases encroached on basic constitutional rights of the citizenry. The majority opinion in this case disregards even that limit, and broadens the trespass into constitutionally protected territory.

In the adoption of this statute, as well as the loyalty oath statute, I have no doubt as to the good intentions of the Legislature, ". . . and I do not consider it the function of the judicial branch of the government to pass upon the wisdom of such proposals. The . . . question before the courts is whether the enactments contravene some provision of the fundamental law—the Constitution. This is true even though a very grave question of public policy may be involved. It is for the Legislature and not the courts to declare the public policy of the state, *providing such declaration is not in conflict with the Constitution.*" (Emphasis added; *Pockman* v.

*Leonard,* 39 Cal.2d 676, 690 [249 P.2d 267], dissenting opinion.) But Government Code, section 1028.1, meets an even broader constitutional objection than did the loyalty oath statute considered in the Pockman case. Without passing upon the wisdom of the public policy behind Government Code, section 1028.1, I believe that this section is clearly a legislative abridgement of the provisions of the Fifth Amendment to the Constitution of the United States and of article I, section 13, of the Constitution of California. The section makes of the public employee a second-class citizen by denying to him, under penalty of exclusion from his means of livelihood, the right to refuse to answer questions which might tend to incriminate him—a right guaranteed to every citizen by the Constitutions of the United States and of California.

In the arguments before this court counsel for Dr. Steinmetz did not emphasize the privilege against self-incrimination. I believe, however, that the Fifth Amendment argument is implicit in this case. Even though Dr. Steinmetz's answers would not have been directly incriminating, he was entitled to rely on the protection of the Fifth Amendment, and its California counterpart, ". . . to avoid a trap for perjury set by those with sufficient influence to have him summoned. . . ." That he did invoke that privilege at the hearing, is clearly shown in the portion of his testimony which is quoted later in this opinion.

The Fifth Amendment to the Constitution of the United States provides in part that "No person . . . shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; . . ." This amendment was adopted in 1791. In California, at the present time, our Constitution provides (art. I, § 13) in part that "No person shall . . . be compelled, in any criminal case, to be a witness against himself; nor be deprived of life, liberty, or property without due process of law; . . ."

The proper application of these constitutional provisions to a modern legislative enactment can best be understood by viewing them in the background of their historical development. Beginning in about the year 1236 A.D. in England, there were ecclesiastical courts which took upon themselves much of the burden of settling various disputes. It was the practice of these courts to submit persons called before them to an "oath ex officio." If the persons summoned to appear did not do so, they were excommunicated; if they did appear

they were forced to give testimony, under oath, of not only the private sins of themselves, but of others. To lawyers schooled in the common law, a system which required a person to furnish his own indictment from his own lips under oath, was repugnant to the law of the land. About 1640, the accused began to claim, and the judges to concede, that a man on trial could not be compelled to answer questions which would disclose his guilt. However, the privilege was not absolute. When a prisoner was arraigned, he was required to identify himself by holding up his right hand or by expressly admitting that he was the person charged. Then he was asked how he would plead. If he refused to plead, the penalty depended upon the grade of the offense with which he was charged. If treason or a misdemeanor, he was treated as if he had pleaded guilty; if a felony, he was confined to prison with a meager allowance of bread and water. Later, in addition to the bread and water diet, he was subjected to torture, which either killed him or induced him within a period of an hour or so, to plead either guilty or not guilty. This horrible and barbaric practice was not discontinued until 1772. At that time a statute was enacted which provided that if a person stood mute on his arraignment of piracy or felony, he should be convicted and the court should award judgment and execution as if he had been convicted by verdict or confession. In 1827, however, standing mute in any criminal case was by statute (7 & 8 Geo., IV) made the equivalent of a plea of not guilty.

This, then, was the background in brief, which led our forefathers to the firm conviction that no man should be compelled to testify against himself.

If one is asked questions about something, the logical way of looking at his refusal to answer is that he surely must know something about it or else why would he refuse to answer? In other words, it is said that the refusal to answer gives rise to an inference of guilt of something. But the only thing which is sure is that the witness has refused to answer. There are no less than three inferences which may be drawn from such a refusal to testify: (1) That the witness is guilty; (2) that he knows something, or some fact, which might tend to incriminate him; and (3) that he refused to answer because he feels that the inquisitor has no right, or business, to ask him such questions. If we go back to the common law as it finally developed, we find that standing mute, in legal effect, pleads not guilty. How can standing

mute be made the cause for punishment of a public servant when it is the legal equivalent of a plea of not guilty? A canon of our law is that it is to be interpreted reasonably in view of accepted common law procedures. We have the old common law which says, in effect, that standing mute is in legal effect a plea of not guilty. We have the present day common assumption that if the witness does not answer, he must have something to hide. And we have the constitutional provisions which say, positively, that no man shall be compelled to be a witness against himself. If he refuses to answer, is he, in effect, pleading guilty to an offense of some sort with the consequent stigma attaching? Or, is he merely standing on his constitutional right which has been guaranteed to him, and if so, should he not be relieved of any and all penalties for having claimed that right?

The privilege against self-incrimination has been characterized by Judge Cardozo (*Matter of Doyle,* 257 N.Y. 244 [177 N.E. 489, 87 A.L.R. 418]) as "a barrier interposed between the individual and the power of the government, a barrier interposed by the sovereign people of the State" which "neither legislators nor judges are free to overleap. . . ." In the light of this definition, let us consider the inquiry authorized by the California Legislature in Government Code, section 1028.1.

The section applies to all public employees. It imposes on each such employee the duty to appear and answer under oath certain questions which may be asked of him when subpoenaed by the governmental agency by which he is employed or by a committee of the Congress of the United States or of the Legislature of California, or by any subcommittee thereof. If he refuses to answer under oath *on any ground whatsoever* any questions of the specified group, he shall be suspended and dismissed from his employment. On the other hand, if he does answer, and his answers indicate that he is a Communist or a member of other proscribed groups, he is subject to dismissal.

A public employee, who is a loyal American citizen, called before such a committee and asked questions pertaining to his membership, past or present, in the Communist Party or in any organization which to his knowledge advocates or advocated during his membership the violent overthrow of the government, might refuse to answer such questions for any one of several reasons: He might have, in the past, joined many different organizations, and has since found that such

organizations have been labelled subversive, or have been used as evidence in prosecutions under the Smith Act, or have been the basis of dismissals as "security risks," or have been labelled "pink" by some pseudo-patriot. While he knows that he is innocent of any wrongdoing, he fears that his former membership in various liberal movements, clubs, charities, etc., may be used against him in some way, and would therefore rather keep such information to himself. Although he may be willing to tell the investigators anything about his own participation in these organization, he feels a sense of loyalty to his friends who had joined with him, and whom he feels are equally innocent of any wrongdoing. He does not want them to be subjected to the public censure which he has encountered because of being called before an investigating body. If he told all that he would be willing to tell about himself, he would have waived the claim of the Fifth Amendment, and could not refuse to answer other questions about his friends. It may also be true that the witness has no first-hand knowledge of the Communist Party or of any other organizations which are of the proscribed type, that he has never joined any organizations of any type, that he is a completely loyal American who believes that the recent rash of security investigations, loyalty oaths, suspicion and distrust has overstepped the boundary of individual liberty and personal security established by the framers of our state and national Constitutions. From his studies of United States history and of the Constitution, he knows that the government has no right to inquire into his private beliefs and associations unless they constitute a clear and present danger to the safety of the nation, which his beliefs and associations obviously do not. He knows that his right to freedom of speech, thought, religion and assembly may not be abridged by the Congress or by the state Legislature. He knows that he may not arbitrarily be deprived of life, liberty or property. He feels that the investigation in which he is involved is not in accord with the spirit which permeates the Constitution, and that to meekly state his innocence would be, in effect, cooperating with those who would destroy or impair the effectiveness of the Constitution and the Bill of Rights. He feels, also, that if he, an obviously innocent person, opposes this invasion into his liberties, the unconstitutional nature of the investigation and of the authority under which it is conducted will be forcefully brought home to the public, and that it will provide the courts with a clear

opportunity to rule on the constitutionality of the statute on which the investigation is based. What a rude awakening it must be when this last witness finds even the courts of his state caught up in the hysteria of the times, to the extent that the statute is held constitutional, and no harm is seen in the dismissal of a loyal public servant with the implication that he is a Communist or that he has been teaching Communist doctrine in his classroom!

Since the statute requires the dismissal of any public employee who refuses to answer the stated questions, on any ground whatsoever, it is too clear to require further discussion that this statute is a legislative attempt to circumvent the Fifth Amendment to the Constitution of the United States and article I, section 13, of the Constitution of California. Since its penalty falls on the innocent as well as the guilty, without even the formality of hearing evidence against the victim, this statute is clearly a deprivation of due process of law guaranteed by the Fourteenth Amendment to the United States Constitution.

Unhappily, there is a tendency on the part of many unthinking members of the public to believe that a witness who invokes a constitutional ground in refusing to testify is disloyal, or is guilty of some misdoing which the investigators were trying to uncover. "There can be no dispute about the consequences visited upon a person excluded from public employment on disloyalty grounds. In the view of the community, the stain is a deep one; indeed, it has become a badge of infamy. Especially is this so in time of cold war and hot emotions when 'each man begins to eye his neighbor as a possible enemy.' . . . To thus inhibit individual freedom of movement is to stifle the flow of democratic expression and controversy at one of its chief sources. . . ." (*Wieman* v. *Updegraff, supra,* 344 U.S. 183, 190.) I believe that two statements made under oath by Dr. Steinmetz at the same hearing where he purportedly refused to answer two of the questions of the investigating board should help those who read this opinion to determine whether Dr. Steinmetz is or is not a loyal American, and why he at first refused to answer the disputed questions.

Dr. Steinmetz first stated under oath: ". . . I should like publicly to reaffirm that I will support and defend the Constitution of the United States and the Constitution of the State of California against all enemies, foreign and domestic; and that I will bear true faith and allegiance to the Con-

stitution of the United States and the Constitution of the State of California; that I take this obligation freely without any mental reservation or purpose of evasion; and that I will and have well and faithfully discharged my duties. Allow me, please, to further affirm . . . that I do not advocate, nor am I a member of any party or organization, political or otherwise, that now advocates the overthrow of the government of the United States or of the State of California by force or violence or other unlawful means; that within the five years . . . preceding the present moment I have not been a member of any party or organization, political or otherwise, that advocated the overthrow of the government of the United States or of the State of California by force or violence or other unlawful means. Also, as I said, I will not advocate nor become a member of any party or organization, political or otherwise, that advocates the overthrow of the government of the United States or of the State of California. . . ."

Later in the hearing, Dr. Steinmetz explained his reason for at first not answering the questions asked by the board, in these words: "I should like . . . to say that with regard to this whole business I wish to disclaim any intent at insubordination. I really deny the constitutionality of the act upon which you are depending because it seems to me to threaten my citizenship in a manner in which none of us can or should be subordinate to each other. The legislation that you have invoked is permissive and not mandatory. You have singled me out for reasons known only to yourselves as if you were exercising a bill of attainder.

"I have been a loyal employee of California since 1930. . . .

"In commenting on your authority I am . . . indebted . . . to certain political science professors at the University of California who taught a course in the United States Constitution that became required by the State Legislature of all pedagogical trainees upon the demand, I believe it was, of the American Legion in 1923. Perhaps I have an unfair advantage in this approach to the problem.

"Mr. Blair, it appears in the legislation that you and the Board are applying to me that Mr. Luckel and Mr. Dilworth have sought to provide that every public employee in California may be required individually or collectively to drop his work and appear at the summons of his superior . . . regardless of existing legal limitations on the responsibility of the superior and the duties of the employee, and to ask the

questions at any time and as often as demanded, and requiring me to answer questions regarding not acts but personal advocacies and political memberships, whether these have been clearly outlawed or not. These questions to be, according to the law, as to or pertaining to such, in the wisdom and the relevance of the occupational superior, the questions and answers to be asked and given publicly or privately as the employer wishes, regardless of charges or of no charges having been made and regardless of oaths already given, duties and responsibilities satisfactorily performed and qualifications and tenure rights. The penalty for not answering or for answering in any but one way being dismissal, even if the employee, seeking to avoid a trap for perjury set by those with sufficient influence to have him summoned in the first place, seeks to use the Bill of Rights.

"Now, ladies and gentlemen, I believe that no legislation is valid that incorporates such a transparent attempt to circumvent the Constitution. Behavior allowed by the U. S. Constitution cannot be declared illegal by a state on the grounds that it is insubordinate, particularly when the behavior is admittedly irrelevant to the duties of a subordinate. . . .

". . . I have been summoned to interrogation of a judicial type because I am a public educator but not for anything that I have done as either an educator or a public employee. Indeed, there being no charge against me the situation is utterly paradoxical, so it should not be taking advantage if I were to demand or attempt an explanation. However, since you find none necessary I find it sufficient at the moment simply to point out this fact. . . . I am sure that all of you members believe in a government of law and not of men, and a government with a clear separation of powers as provided by the Constitution, and I am sure you have probably sworn an oath necessitating such convictions. You must then recognize that the assumption or assignment of judicial powers by or to a legislative committee, or executive agency, or policy commission such as yours is unconstitutional and, if I may add, I think in my opinion subversive to the Bill of Rights.

"The California Legislature has mistakenly authorized you to ask questions that are accusing in effect especially when directed to an individual; questions permitting of but one answer such as usually characterized police state questions; questions that as in my case are totally unnecessary if they are legal because their proper answer is already known so

their only point would seem to be to coerce or entrap; questions which have already been answered; and questions which can certainly tempt the unscrupulous to destroy rather than to compete with political opposition by identifying honest dissent with disloyalty in a manner utterly intolerable to free men. Please recognize that I am attributing no motive to you save perhaps the experimental use of a new law.

"I am really questioning not your authority so much as the authority of the Legislature. Not from the standpoint of distrust in our institutions but obviously with a profound trust in our judiciary and electorate. My viewpoint is less radical than very conservative as befits the descendant of the American Revolution fully acquainted with our national traditions, I hope, and very proud of them. The present is the only part of history for which the individual may be responsible and I feel a profound responsibility for the precedent that I must set in the situation in which you have placed me. I believe that freedom from the political inquisition demeaning public confession and patronizing absolution is necessary for general education, a free press, an instructive and inspiring literature in art, and every other manifestation of culture in America. In these days of vaunted political regard for freedom in the Western World I contend that property rights as well as civil rights are jeopardized by its sacrifice. If I can be arbitrarily summoned for public humiliation and told by the act under which you are proceeding that I cannot use the Bill of Rights to avoid jeopardy from political enemies then no man is safe from those in temporary power, indeed then no secret will be safe and political power may cease to be temporary and become totalitarian. No self-respecting citizen can find satisfaction in work for any employer, public or private, who can hold him under constant threat for political dissent. Public employment ceases to be either right or privilege or duty an obligation under such circumstances. . . . [I]t is really the vicious permissiveness of the law that threatens. And I oppose that in principle and shall continue to oppose it if it is necessary until the Supreme Court passes upon it. . . ."

One must be indeed naive if he cannot see the parallel between the situation of Dr. Steinmetz before this investigating board, and the witness called before the ecclesiastical court or Star Chamber in England in the 15th, 16th or 17th centuries. The very evils which prompted an early Congress to add to our Constitution the protection of the Bill of

Rights are now being revisited upon us by a statute which purports to protect our constitutional form of government.

Other arguments which are raised by Dr. Steinmetz in his petition, and which I believe are meritorious, are (1) that the Luckel Act (Gov. Code, §§ 1027.5, 1028 and 1028.1) is special legislation which contravenes article I, section 11, and article IV, section 25(33), of the California Constitution; the Fourteenth Amendment to the United States Constitution; and this court's opinion in *Communist Party* v. *Peek,* 20 Cal.2d 536 [127 P.2d 889] (see also *In re Campbell,* 64 Cal.App. 300 [221 P. 952]); (2) that the Luckel Act is, in essence, a bill of attainder (*Garner* v. *Los Angeles Board, supra,* 341 U.S. 716, 722; *Cummings* v. *State of Missouri,* 4 Wall. (U.S.) 277 [18 L.Ed. 356]; *Ex parte Garland,* 4 Wall. (U.S.) 333 [18 L.Ed. 366]; (3) that the Luckel Act offends against the principle of separation of powers (Cal. Const., art. III, § 1, and art. VI, § 1).

In the recent case of *Daniman* v. *Board of Higher Education of New York* (reported at 306 N.Y. 532 [119 N.E.2d 373]), the New York Court of Appeals held constitutional a New York City Charter section which in some respects is very similar to the statute being considered in this case. The New York City Charter section (903) directed dismissal of any city employee who should refuse to testify in any authorized hearing or inquiry concerning city affairs or official conduct of officers or employees of the city. Appellant Slochower, a college professor, was dismissed under the authority of this charter section when he refused to state, when asked by a Senate investigating committee, whether he had been a member of the Communist Party. A majority of the highest court of the State of New York in that case, just like the majority of this court in this case, saw no infringement of the public employee's constitutional rights in the charter provision or in its application. In the Slochower case the Supreme Court of the United States has noted probable jurisdiction. I am confident that the Supreme Court of the United States will reverse the state court decision in the Slochower case. I feel even more strongly that the Supreme Court of the United States should reverse the erroneous decision of the majority of this court in the present case.

In summary, I dissent from the holding of the majority here because I believe (1) that Government Code, section 1028.1, is an attempt by the Legislature to abridge the rights of certain citizens, guaranteed to them by the Fifth Amend-

ment to the Constitution of the United States and by article I, section 13, of the Constitution of California; (2) that Government Code, section 1028.1, as it has been construed by the majority in this case, is unconstitutional under the views expressed in the Wieman, Gerende, Garner, Adler, Pockman and Hirschman cases; and finally, (3) that if Government Code, section 1028.1, should be considered constitutional, then clearly Dr. Steinmetz has not violated its provisions, since he substantially answered all of the questions asked of him by the investigating board.

I am of the opinion that the requested writ of mandate should issue, and that Dr. Steinmetz should be reinstated to his former position.