[L.A. No. 29926. In Bank. Dec. 30, 1971.]

ALBERT E. MONROE, Plaintiff and Appellant, v.
TRUSTEES OF THE CALIFORNIA STATE COLLEGES,
Defendant and Respondent.

## COUNSEL

Gibson, Dunn & Crutcher, Samuel O. Pruitt, Jr., Paul G. Bower, Bette B. Gallo, Don Parris, David A. Cathcart, Thomas E. Gallagher, Joan L. Freeman, Robert A. Miller and Merle W. Wood II for Plaintiff and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Sanford N. Gruskin, Assistant Attorney General, Henry G. Ullerich and Howard J. Schwab, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

**TOBRINER, J.**—In November 1950, Albert E. Monroe (hereinafter petitioner), then a tenured, full professor and Chairman of the Language Arts Division at San Francisco State College, was discharged from his teaching position solely on the basis of his refusal to sign the "Levering Oath," a loyalty oath formerly embodied in section 3103 of the Government Code. In 1952 this court in *Pockman* v. *Leonard* (1952) 39 Cal.2d 676 [249 P.2d 267], upheld the Levering Oath in the face of a constitutional attack, but in 1967, in *Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18 [64 Cal.Rptr. 409, 434 P.2d 961], we expressly overruled *Pockman* and concluded that the Levering Oath, proscribing public employees' mere membership in certain organizations, constituted an unconstitutional infringement of First Amendment rights.

One week after *Vogel* became final, Monroe wrote to the Trustees of the California State Colleges, respondent herein, requesting, in light of *Vogel,* reinstatement to his former position and restoration of lost salary and pension rights; the Trustees, acting without a hearing, refused to grant petitioner either reinstatement or the restoration of any financial benefits. Monroe then filed his petition in the instant action, seeking a writ of mandate to compel the Trustees (1) to reinstate him to his former position, (2) to restore his pension rights upon payment of his required contribution, and (3) to reimburse him for the difference between the salary he would have earned if he had not been discharged and the salary he actually earned in other employment, a sum of $79,000. The trial court sustained a general demurrer to Monroe's first amended petition with leave to amend, and upon petitioner's failure to amend, entered an order dismissing Monroe's petition; it is from that order that petitioner Monroe now appeals.

To support the order sustaining the general demurrer, the Trustees contend primarily that petitioner's own pleading reveals on its face that the present action encounters the bar of the applicable statute of limitations, since its allegations demonstrate that Monroe's discharge became final in the early 1950's. As discussed more fully below, however, we have determined that although the statute of limitations does presently preclude an attack on petitioner's *initial discharge,* the instant complaint attacks not only the propriety of the 1950 discharge but also the validity of the Trustees' *refusal to reinstate* Monroe in 1968, after the *Vogel* decision. Insofar as the Trustees' 1968 refusal to reinstate him constitutes the basis of petitioner's suit, we conclude that this action, commenced in December 1968, was timely filed.

Moreover, we hold that the allegations of the present pleadings establish petitioner's right to reinstatement because they show that even after *Vogel* exposed the constitutional infirmity of the basis for his discharge the Trustees summarily denied reinstatement: they held no hearing on his petition nor did they render any finding on the question of whether any "cause" remained to justify Monroe's continued forced separation from the state college system. Finally, we conclude that, although petitioner has properly set forth his right to reinstatement as of 1968, he does not establish the right to back pay or to the restoration of pension benefits which accrued between 1950 and 1968, because those incidental remedies could only flow from an invalidation of his *initial* discharge, and the statute of limitations has run on such a claim. Under the circumstances of the instant case, petitioner is entitled only to the restoration of pension rights obtained prior to his 1950 discharge and to back pay and pension benefits which have accrued since the Trustees' refusal to reinstate him in 1968.

We begin our analysis with a review of the relevant facts. ■ In determining the sufficiency of petitioner's amended complaint against a demurrer, we must, of course, treat the demurrer as admitting all material facts properly pleaded. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241]; *Daar* v. *Yellow Cab Co.* (1967) 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732].) According to the amended complaint, until November 4, 1950, petitioner taught at San Francisco State College as a full professor, with tenure under the California state college system, serving as chairman of the college's Language Arts Division. On November 4, 1950, Monroe suffered dismissal from his position solely because he would not sign the newly enacted state loyalty oath, the "Levering Oath";[1] petitioner's refusal to sign the oath rested entirely on

---

[1] The "Levering Oath," embodied in 1950 in section 3103 of the Government Code, read in full:

"And I do further swear (or affirm) that I do not advocate, nor am I a member of any party or organization, political or otherwise, that now advocates the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means; that within the five years immediately preceding the taking of this oath (or affirmation) I have not been a member of any party or organization, political or otherwise, that advocated the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means except as follows:

". . . . . . . . . . . . . . . . .
(If no affiliations, write in the words 'No Exceptions') and that during such time as I am a member or employee of the . . . . . . . . . . . . . . . . . . . (name of public agency) I will not advocate nor become a member of any party or organization, political or otherwise, that advocates the overthrow of the Government of the United States or of the State of California by force or violence or other unlawful means."

In 1953, the text of the oath was transferred to section 3 of article XX of the California Constitution.

his conscientious belief that the oath embodied an unconstitutional abridgement of academic freedom and his constitutional rights of freedom of speech, freedom of assembly and freedom of association.

In October 1952, while Monroe was duly challenging his discharge through the appropriate administrative channels, this court upheld the constitutionality of the Levering Oath in the case of *Pockman* v. *Leonard* (1952) 39 Cal.2d 676 [249 P.2d 267]. Thereafter the State Personnel Board sustained Monroe's dismissal on September 11, 1953. Reasoning that resort to the judiciary at that time would obviously be futile in light of the then-recent *Pockman* decision, Monroe did not challenge the State Personnel Board's affirmance of his dismissal in the courts.

On December 21, 1967, however, in *Vogel* v. *County of Los Angeles* (1967) 68 Cal.2d 18 [64 Cal.Rptr. 409, 434 P.2d 961], this court concluded that the Levering Oath was unconstitutional and expressly overruled our earlier *Pockman* decision; *Vogel* became final on March 20, 1968. On March 26, 1968, petitioner wrote to the Trustees of the California State Colleges, requesting (1) that he be reinstated to his position, (2) that his pension rights be restored upon his payment of the requisite contribution to the pension fund, and (3) that he be reimbursed for the difference between the salary he would have earned if he had not been dismissed and the salary he actually earned in other employment. The Trustees declined either to reinstate petitioner or to authorize the restoration of pension rights and the reimbursement of back pay. On May 7, 1968, petitioner filed with the State Board of Control his claim for the differential in back pay, some $79,000, as well as his claim for the restoration of pension benefits; these claims were rejected a month later, on June 18, 1968. On December 18, 1968, Monroe filed his initial petition for writ of mandate in the instant action.

In addition to describing the foregoing chronology of events, Monroe's pleading alleges that the state college system would not be burdened by his reinstatement because of a current shortage of teachers with petitioner's professional qualifications; the petition asserts that no person will be required to be dismissed or demoted to accommodate Monroe's reinstatement. Petitioner further alleges that over the years not more than 15 persons throughout the state have been dismissed for refusing to sign the Levering Oath, and that, as a result, the possible financial burden to the state, in the event of a ruling fully favorable to his position, would not exceed $500,000. Finally, Monroe declares that he is fully willing to sign the present loyalty oath contained in article XX, section 3 of the California Constitution; indeed he notes that when he first entered service at San

Francisco State College he signed a substantially identical loyalty oath, which he has never repudiated.

As noted above, the Trustees' primary contention in support of the demurrer is that petitioner's pleading reveals on its face that it is barred by the applicable statute of limitations. We address this issue first.

■ 1. *Insofar as petitioner attacks the Trustees' refusal to reinstate him in 1968, and not his initial discharge in 1950, the statute of limitations begins to run from April 1968, and the present action commenced in December 1968, was timely filed.*

Although there is some dispute between the parties as to whether the governing limitations period in this matter is one year, as the Trustees urge (see Gov. Code, §§ 19630, 945.6), or three years, as petitioner suggests (see Code Civ. Proc., § 338, subd. 1; *Lerner* v. *Los Angeles City Board of Education* (1963) 59 Cal.2d 382, 389 [29 Cal.Rptr. 657, 380 P.2d 97]), the crucial question turns not upon the appropriate length of the limitations period, but instead, upon the date from which the appropriate period is to commence. If, as the Trustees contend, the statute of limitations starts to run from *September 1953,* when petitioner's dismissal became final with the exhaustion of his administrative remedies, then, whether the applicable limitations period is one year or three years, petitioner's claim clearly comes too late. If, however, the limitations period is to be measured from *April 1968,* when the Trustees denied reinstatement despite our decision in *Vogel,* as petitioner suggests, then this action, instituted in December 1968, would be timely under either a one-year or three-year limitations period. ■ Well established precedent decrees, of course, that the statute of limitations in a mandamus proceeding "begins to run when the [petitioner's] right first accrues. [Citations.]" (*Barlow* v. *City Council of Inglewood* (1948) 32 Cal.2d 688, 697 [197 P.2d 721]; see Code Civ. Proc., §§ 1109, 312). Thus, our initial task is to determine the date upon which the claimed right of petitioner arose.

The Trustees, characterizing petitioner's suit as, in effect, purely an action for wrongful discharge, contend that petitioner's action accrued in 1953, when his discharge became final by virtue of the decision of the State Personnel Board.[2] If the gravamen of Monroe's action were solely the

---

[2]Under traditional terminology, it is perhaps more precise to view the claim of improper discharge as "accruing" on the date of the actual discharge and to consider the statute of limitations as "tolled" while the claimant pursues available administrative remedies. (See, e.g., *Dillon* v. *Board of Pension Commrs.* (1941) 18 Cal.2d 427, 430-431 [116 P.2d 37, 136 A.L.R. 800].) Thus, defendant Trustees' contention may more accurately be characterized, as positing that petitioner's cause

impropriety of his initial discharge we would agree that the statute of limitations would presently preclude his action. (See, e.g., *Stockton* v. *Department of Employment* (1944) 25 Cal.2d 264, 267-268 [153 P.2d 741]; *Mayer* v. *Board of Police Commrs.* (1934) 136 Cal.App. 534, 536-537 [29 P.2d 458]; *Curtin* v. *Board of Police Commissioners* (1925) 74 Cal.App. 77, 82-83 [239 P. 355]; cf. *Dillon* v. *Board of Pension Commrs.* (1941) 18 Cal.2d 427, 431 [116 P.2d 37, 136 A.L.R. 800].)

Although both parties have suggested that the issue of whether the statute of limitations began to run *as to the initial discharge* in 1953 turns on the question of *Vogel's* retroactivity—petitioner arguing that *Vogel* is retroactive and thus that the statute did not run, and the Trustees contending that *Vogel* is only prospective and thus that the statute has expired— both of these positions reveal a fundamental misunderstanding of the traditional effect of a "retroactive" judicial decision. ■ The normal "retroactivity" of most civil decisions has never been thought to supersede the operation of the statute of limitations so as to revive old claims which were not pursued because of a previously prevailing contrary rule of law,[3] or to reincarnate dead causes which had fallen to the sword

of action for wrongful discharge accrued in 1950, but that the limitations period did not begin to run until the exhaustion of his administrative remedies in 1953. Because no one contends that the limitations period started to run prior to 1953, for convenience we simply refer to 1953 as the date of "accrual" of the "wrongful discharge" cause of action.

[3]Petitioner has not identified any civil case, and our independent research has disclosed none, in which the retroactive operation of a judicial decision—even a constitutional one—has been held to revive old causes of action on which the statute of limitations had already run.

In the criminal field, on the other hand, courts have long found it appropriate, under certain circumstances, to grant the benefits of a change in constitutional standards to imprisoned individuals whose time for challenging their convictions had already expired. (See, e.g., *Ex Parte Siebold* (1879) 100 U.S. 371, 376-377 [25 L.Ed. 717, 719]; *In re Bell* (1942) 19 Cal.2d 488, 492-495 [122 P.2d 22].) In large part, this development may be attributable to the historically unique procedural attributes of the "Great Writ," the writ of habeas corpus (see, e.g., *Fay* v. *Noia* (1963) 372 U.S. 391, 399-414 [9 L.Ed.2d 837, 845-854, 83 S.Ct. 822]; *In re Bell* (1942) 19 Cal.2d 488, 493 [122 P.2d 22]. See generally Mishkin, *Forward: The High Court, the Great Writ and Due Process of Time and Law* (1965) 79 Harv.L.Rev. 56, 77-92.) Substantively, of course, it is not difficult to understand the rationale behind the judicial conclusion that it is improper to keep an individual languishing in prison when, for example, the criminal statute under which he was committed has been declared unconstitutional. (See e.g., *In re Bell* (1942) 19 Cal.2d 488, 493 [122 P.2d 22].) Given the continuing nature of the penal sanction, and the fact that "personal liberty is of so great moment in the eye of the law" (*Ex parte Siebold* (1879) 100 U.S. 371, 377 [25 L.Ed. 717, 719]), courts have recognized that in many circumstances it is unconscionable to continue imprisonment even though an individual's time for appeal may have elapsed. "[The] root principle [of the writ of habeas corpus] is that in a civilized society, government must always

of the statute. Instead, the retroactive application of a judicial decision has traditionally meant only that the rule of law established by the new decision governs events occurring prior to the date of decision, *when such events are at issue in timely filed actions.* For example, although this court's decision in *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457], abrogating a general governmental immunity to tort claims, was given normal retroactive effect, we recognized that litigants who suffered injury at the hands of the government prior to *Muskopf* would be barred from recovery unless their suits had been "filed within the ordinary limitations period provided for tort actions." (*Corning Hospital Dist.* v. *Superior Court* (1962) 57 Cal.2d 488, 494 [20 Cal.Rptr. 621, 370 P.2d 325]; see *Dias* v. *Eden Township Hospital Dist.* (1962) 57 Cal.2d 502, 503-504 [20 Cal.Rptr. 630, 370 P.2d 334]; cf., *Estate of Horman* (1971) 5 Cal.3d 62, 70-72 [95 Cal.Rptr. 433, 485 P.2d 785].) ■ Thus, though we agree with petitioner that our decision in *Vogel* should be given a normal, retroactive effect,[4] such a con-

---

be accountable to the judiciary for a man's imprisonment: if the imprisonment cannot be shown to conform with the fundamental requirements of law, the individual is entitled to his immediate release." (*Fay* v. *Noia* (1963) 372 U.S. 391, 402 [9 L.Ed.2d 837, 846-847, 83 S.Ct. 822].)

As discussed above, to our knowledge, the doctrine of "full retroactivity" in criminal cases, i.e., release regardless of the date of conviction, has not yet been applied in civil litigation. We note, however, that since we have determined *infra* that, as a matter of state law, petitioner became entitled to reinstatement to his teaching position once the sole ground for his discharge was revealed as constitutionally invalid, the relief afforded petitioner from the continuing disabilities of the earlier unconstitutional action is somewhat analogous to the release of a prisoner, through habeas corpus, under a "fully retroactive" criminal decision.

[4]Our *Vogel* decision, in overruling *Pockman,* relied on a series of United States Supreme Court cases, dating back to the 1950's which had undermined the constitutional premises upon which *Pockman* rested. (E.g., *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589 [17 L.Ed.2d 629, 87 S.Ct. 675]; *Sherbert* v. *Verner* (1963) 374 U.S. 398, 404-406 [10 L.Ed.2d 965, 970-971, 83 S.Ct. 1790]; *Speiser* v. *Randall* (1958) 357 U.S. 513, 518-519 [2 L.Ed.2d 1460, 1468-1469, 78 S.Ct. 1332].) We find nothing in either the language or purpose of the *Vogel* decision to indicate that the court intended that decision to effect anything other than a normal retroactive consequence.

Insofar as we have been able to determine, no court, in invalidating a loyalty oath on constitutional grounds, has ever denied relief to an individual on the theory that the state had, in some sense, "justifiably relied" on prior judicial decisions upholding the oath. Rather, courts have uniformly applied their decisions "retroactively," to afford relief to any individual who had successfully attacked the constitutionality of a questioned oath through a timely challenge to his exclusion or discharge from public employment (see, e.g., *Elfbrandt* v. *Russell* (1963) 94 Ariz. 1 [381 P.2d 554], vacated and remanded for reconsideration in light of *Baggett* v. *Bullitt* [(1964) 377 U.S. 360 [12 L.Ed.2d 377, 84 S.Ct. 1316]] (1964) 378 U.S. 127 [12 L.Ed.2d 744, 84 S.Ct. 1658], *reinstated* (1964) 97 Ariz. 140 [397 P.2d 944], *reversed* (1966) 384 U.S. 11 [16 L.Ed.2d 321, 86 S.Ct. 1238]; *Torcaso* v.

clusion means only that a public employee who had been discharged on the basis of the Levering Oath prior to *Vogel,* and who had challenged his discharge within the appropriate limitations period, can directly reap the benefits of *Vogel's* retroactive application.[5]

Thus, if the instant suit simply attacked the propriety of Monroe's initial discharge, as the Trustees assert, this cause of action would have accrued in September 1953 and the applicable limitations period would have long since run. In our view, however, the Trustees' characterization of Monroe's suit as exclusively an action for wrongful discharge, disregards one main thrust of his challenged plea. The amended petition for writ of mandate does not solely attack petitioner's dismissal in 1950, but instead also challenges the Trustees' refusal to reinstate petitioner in 1968, after the *Vogel* case had determined the unconstitutional status of the Levering Oath. Rather than constituting merely an action for wrongful discharge, the instant suit additionally embodies a claim for "wrongful refusal to reinstate"; with respect to this claim, petitioner's action accrued only in 1968, when the Trustees summarily declined to reinstate him after the *Vogel* decision had invalidated the loyalty oath. Thus, insofar as it challenges the Trustees' refusal to reinstate him, petitioner's action, instituted in December 1968, has been timely filed.

*Lerner* v. *Los Angeles City Board of Education* (1963) 59 Cal.2d 382 [29 Cal.Rptr. 657, 380 P.2d 97], is directly in point. In *Lerner* the State Board of Education, acting pursuant to a newly enacted statute, summarily revoked Lerner's teaching credential in 1954 on the basis of a 1948 sex offense. Upon notification of the state board's revocation, and solely because of that action, the city board of education terminated Lerner's employment in 1954. Thereafter, in 1958, the Court of Appeal

---

*Watkins* (1961) 367 U.S. 488 [6 L.Ed.2d 982, 81 S.Ct. 1680]) even when the invalidation required an overruling or disapproval of earlier precedent. (See, e.g., *Keyishian* v. *Board of Regents* (1967) 385 U.S. 589, 605-610 [17 L.Ed.2d 629, 641-645, 87 S.Ct. 675] (invalidating New York Feinberg Law previously upheld in *Adler* v. *Board of Education* (1952) 342 U.S. 485 [96 L.Ed. 517, 72 S.Ct. 380, 27 A.L.R.2d 472]).) We believe our *Vogel* decision must properly be recognized as having a similar retroactive effect.

[5]In addition to relying on the retroactivity of *Vogel,* petitioner alternatively contends that the statute of limitations did not begin to run on his claim for wrongful discharge until 1968 because until that date it was allegedly "impossible" for petitioner to attack the State Personnel Board's decision. No legal obstacle barred a judicial challenge to petitioner's initial discharge, however, and the mere existence of a contrary precedent has never been considered sufficient to toll the running of the statute of limitations. (See *Estate of Horman* (1971) 5 Cal.3d 62, 71 [95 Cal.Rptr. 433, 485 P.2d 785].) As discussed at length *infra,* the decision of *Lerner* v. *Los Angeles City Board of Education* (1963) 59 Cal.2d 382 [29 Cal.Rptr. 657, 380 P.2d 97], involved the accrual of a separate cause of action for *wrongful refusal to reinstate,* rather than a "delayed accrual" of a *wrongful discharge* action.

in a separate case held that a summary dismissal of a teacher on the basis of an offense committed prior to the enactment of the statute was invalid. (*Fountain* v. *State Board of Education* (1958) 157 Cal.App.2d 463 [320 P.2d 899]; see *DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167 [18 Cal.Rptr. 369, 367 P.2d 865].) As a consequence, the state board voluntarily restored Lerner's credential in 1958. When Lerner requested the city board to reinstate him to his former position, however, the city board summarily refused. Lerner thereafter brought suit against the city board, contending that it had wrongfully failed to reinstate him.

The city claimed that since Lerner had been dismissed in 1954 and had not instituted his action until 1958, his suit was barred by the applicable three-year statute of limitations. Our court, however, rejected the city's contention that Lerner's action accrued on the date of the discharge, and instead concluded that his action accrued at the time the city board declined to reinstate him after his credential had been restored. We held: *"Lerner's effective cause of action arose in July 1958 when, despite the restoration of his credential, the city board refused to reinstate him and changed its position to a reliance upon statutory provisions for dismissal without affording him the requisite notice and hearing.* The city board had terminated Lerner's employment on December 14, 1954, solely on the ground of ineligibility because of the revocation of his state teaching credential. . . . [W]hen the state board reinstated Lerner's credential . . . the state board removed the basis for the city board's termination of his employment; *the city board in turn became obligated to reinstate him.* [Citation.] . . . [Par.] . . . [T]*he liability of the city board accrued at the time it . . . changed its position on or after July 2, 1958, the date of the state board's restoration of Lerner's teaching credential."* (Italics of final sentence in original; other italics added.) (59 Cal.2d at pp. 390-391.)

The *Lerner* court thus held that the wrongful act which gave rise to the teacher's action was the city board's refusal to reinstate Lerner after the sole basis for his earlier termination had been removed. Similarly, in the instant case, the conduct which generated petitioner's present complaint was the refusal of the Trustees to reinstate him after the *Vogel* case had negated the validity of the sole ground of his dismissal. Although in the instant case petitioner is proceeding against a state body rather than a local board as in *Lerner*, the refusal to reinstate remains the crux of the litigation. (See also *Mass* v. *Board of Education* (1964) 61 Cal.2d 612, 624 [39 Cal.Rptr. 739, 394 P.2d 579].) Under these circumstances, we conclude that petitioner's cause of action for reinstatement accrued in 1968 and thus that this suit is not barred by the statute of limitations.

*2. Under the allegations of the present pleadings, petitioner is entitled to reinstatement, since under Vogel v. County of Los Angeles petitioner's refusal to sign the Levering Oath can no longer constitutionally justify his compelled separation from his tenured teaching position.*

Our decision in *Lerner* not only refutes the Trustees' statute of limitations contention but, in addition, provides authority for petitioner's substantive claim to reinstatement. In *Lerner* we held that once the state board had returned Lerner's teaching credential, and thus had removed the sole basis for the city board's termination of his employment, the city board "became obligated to reinstate him." (59 Cal.2d at p. 390.) We reasoned that since at the time of his termination Lerner possessed full tenure rights, protecting him from dismissal without hearing and without a showing of "cause," once his sole "disability," i.e., the revocation of his teaching credential, was removed, the city board could not continue to bar him from employment without complying with the statutory requirements of notice and hearing. (59 Cal.2d at p. 391.)

Similarly, in the instant case, the petition alleges that Monroe possessed full tenure rights in 1950[6] when his employment was terminated *solely* on the basis of his refusal to sign the Levering Oath. Under sections 3102 and 3107 of the Government Code, Monroe's refusal to sign the loyalty oath operated as an automatic bar to his retention of a public employment position. ■ Our decision in *Vogel v. County of Los Angeles* (1968) 68 Cal.2d 18 [64 Cal.Rptr. 409, 434 P.2d 961], however, invalidated that oath as unconstitutional, and in so doing, removed the sole disability supporting Monroe's compelled separation from his tenured professorship position. Title 5, section 43550 of the California Administrative Code, a regulation adopted by the Trustees of the state college system pursuant to Education Code sections 22607, 22604 and 24201, provides: "The appointing power [i.e., the Trustees (see Ed. Code, § 22607)] shall reinstate any employee, who meets all employment requirements, and who left his classification with reinstatement rights *as prescribed by law* or by these rules, to a position in the classification which he left or the equivalent thereof. . . ." (Italics added.) Since Monroe's dismissal in 1950 rested

---

[6]At the time of petitioner's discharge, his tenure rights were embodied in sections 20391 to 20394.11 of the Education Code. Subsequently, the Trustees of the California State College was created as an independent statutory entity (see Ed. Code, § 22600 et seq.) with authority to promulgate regulations pertaining to employment and tenure; the Legislature specifically provided, however, that the accrued tenure rights of past employees were to be preserved (see Ed. Code, § 22607). It is clear, in any event, that under both past and present tenure regulations, a tenured employee can be dismissed from his position only after notice and hearing and only for statutorily prescribed "cause." (See, e.g., Ed. Code, §§ 24306, 24308, 24309.)

solely on his presently recognized exercise of a constitutionally protected right, we hold that as a matter of law he "left his classification with reinstatement rights" and thus that, pursuant to section 43550, he is now entitled to reinstatement.

Without this reinstatement remedy provided by section 43550, the state, through respondent Trustees, would, as a practical matter, be continuing to punish Monroe for the expression of a First Amendment right. Our decision in *Vogel* makes clear that the Levering Oath "is invalid because it bars persons from public employment for a type of association that may not be proscribed consistently with First Amendment rights." (68 Cal.2d at p. 22.) We must realistically recognize that the dismissal of Monroe for refusing to sign this "loyalty oath" carries with it several ongoing "disabilities," including both the stigma of the dismissal (see *Wieman* v. *Updegraff* (1952) 344 U.S. 183, 190-191 [97 L.Ed. 216, 221-222, 73 S.Ct. 215]; cf. *Wisconsin* v. *Constantineau* (1971) 400 U.S. 433, 437 [27 L.Ed.2d 515, 519, 91 S.Ct. 507])[7] and the deprivation of a position in his chosen profession. In the absence of reinstatement, these sanctions would be perpetuated; reinstatement operates to prevent any further injury that might flow from Monroe's conscientious adherence to now-accepted constitutional principles.

In addition, we believe that if Monroe were now to be denied reinstatement even though his First Amendment beliefs—and actions thereon—have finally been vindicated, others might be "chilled" from fully exercising their rights of freedom of speech and freedom of association. Given the "sensitive nature" of these First Amendment rights (see, e.g., *Dombrowski* v. *Pfister* (1965) 380 U.S. 479, 486 [14 L.Ed.2d 22, 28, 85 S.Ct. 1116]), and their special importance in our schools and colleges (see, e.g., *Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503, 511-514 [21 L.Ed.2d 731, 740-742, 89 S.Ct. 733]; *Shelton* v. *Tucker* (1960) 364 U.S. 479, 487 [5 L.Ed.2d 231, 236-237, 81 S.Ct. 247]; *Wieman* v. *Updegraff* (1952) 344 U.S. 183, 195 [97 L.Ed. 216, 224, 73 S.Ct. 215] (Frankfurter, J. concurring)), we believe that we must emphatically uphold a right to reinstatement under the circumstances of this case.

Finally, reinstatement will serve a further purpose implicitly underlying our *Vogel* decision. In *Keyishian* v. *Board of Regents* (1967) 385 U. S. 589, 603 [17 L.Ed.2d 629, 640, 87 S.Ct. 675], one of the principal decisions relied on in *Vogel*, the United States Supreme Court, in invalidating New York's "anti-subversive" Feinberg Law, emphasized: "Our Nation

---

[7]In upholding petitioner's dismissal in 1953, the State Personnel Board concluded that Professor Monroe "was guilty of gross unprofessional conduct" in refusing to subscribe to the Levering Oath.

is deeply committed to safeguarding academic freedom, which is of trans-cendant value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom . . . The classroom is peculiarly the 'market place of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any authoritative selection.' [citation]." The reinstatement of petitioner, and other similarly situated teachers, will serve to broaden, and thereby enrich, the academic community by rein-troducing into that community individuals with conscientiously held beliefs and ideals, beliefs which in the past have been excluded from the public schools simply because of official disapproval. If a reinstatement remedy were not available, the "pall of orthodoxy" resulting from earlier exclu-sionary policies would continue to inhibit the present educational environ-ment. (See Stewart, The Year of the Oath, pp. 58-64.) Thus, all of society benefits from petitioner's present right to reinstatement. (See also *Sweezy* v. *New Hampshire* (1957) 354 U.S. 234, 250 [1 L.Ed.2d 1311, 1324-1325, 77 S.Ct. 1203]; *Wieman* v. *Updegraff* (1952) 344 U.S. 183, 195-197 [97 L.Ed. 216, 224-225, 73 S.Ct. 215] (Frankfurter, J. concurring).)

This "right to reinstatement," of course, in no way precludes the Trustees from inquiring into petitioner's present qualifications for his professorship status or from reordering his dismissal if it is determined, after notice and hearing, that there are grounds to justify the discharge of petitioner from his tenured position. ▇ Petitioner's past refusal to sign the Levering Oath, however, cannot properly be viewed as having any rational relation to his present fitness to teach, or as otherwise constituting "cause" for his dismissal. (See *Wilson* v. *City of Los Angeles* (1960) 54 Cal.2d 61, 65 [4 Cal.Rptr. 489, 351 P.2d 761]; cf. *Morrison* v. *State Board of Education* (1969) 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375].) The facts which presently appear afford no basis for doubting petitioner's present fitness for the professorship post from which he was removed; indeed, the challenged pleading specifically alleges that Monroe is so qualified.

We recognize, of course, that in some cases reinstatement may pose a variety of administrative problems, if, for example, another employee pres-ently occupies the post to which reinstatement is sought. In such cases, practical considerations will certainly justify a reasonable accommodation of the various interests at stake, and the reinstated employee can properly be offered a reasonable alternative position. ▇ The practical considera-tions involved, however, obviously cannot justify denying an entitled em-ployee reinstatement altogether, and section 43550 implicitly recognizes

this principle by establishing a right to reinstatement "to a position in the classification which he left or the equivalent thereof." In the instant case, of course, petitioner Monroe specifically alleges that his reinstatement will require no person to be dismissed or demoted.[8]

3. *Although petitioner is presently entitled to reinstatement, he cannot recover back pay and pension benefits accruing after his initial discharge but prior to his request for reinstatement.*

As discussed above, we have concluded that in light of the fact that the sole ground for petitioner's dismissal was revealed by *Vogel* as constitutionally invalid, petitioner should be reinstated pursuant to title 5, section 43550 of the California Administrative Code. As provided by section 43550[9] such reinstatement includes the restoration of all benefits and credits for prior service which petitioner enjoyed at the time of his initial separation; this reinstatement does not, however, encompass lost pay or pension benefits accruing after petitioner's discharge but prior to 1968.

Although petitioner claims that back pay and restoration of pension benefits are traditionally incidents of reinstatement, the authorities relied upon all involve reinstatements ordered as a result of successful attacks upon employees' initial discharges. (E.g., *Mass* v. *Board of Education* (1964) 61 Cal.2d 612 [39 Cal.Rptr. 739, 394 P.2d 579]; *Beseman* v. *Remy* (1951) 160 Cal.App.2d 437 [325 P.2d 578]; cf. Ed. Code, § 24310.) In the instant case, as discussed above, petitioner is presently precluded by the statute of limitations from attacking his initial dismissal, and the target of the present suit thus must properly be viewed only as the Trustees' refusal to reinstate him in 1968. In this posture, we conclude that petitioner cannot recover the interim benefits arising before his request for reinstatement in 1968. (Cf. *Fry* v. *Board of Education* (1941) 17 Cal.2d 753, 761 [112 P.2d 229].) On the other hand, if petitioner can prove the allegations of his petition at trial, he would be entitled to any lost pay and ancillary benefits accruing after his right to reinstatement arose.

In sum, we have concluded that insofar as the present action challenges the Trustees' refusal to reinstate petitioner after *Vogel* and not petitioner's original discharge, the statute of limitations did not begin to run until

[8]The practical considerations involved in the instant circumstances appear to be of no greater moment than those commonly arising when a dismissed employee successfully challenges his original discharge and is granted reinstatement. (See, e.g., Ed. Code, § 24310; *Mass* v. *Board of Education* (1964) 61 Cal.2d 612 [39 Cal.Rptr. 739, 394 P.2d 579]; *DiGenova* v. *State Board of Education* (1962) 57 Cal.2d 167 [18 Cal.Rptr. 369, 367 P.2d 865].)

[9]Section 43550 provides that a reinstated employee "shall not lose any benefits or credit for prior service enjoyed at the time of separation."

April 1968, when despite *Vogel*, the Trustees declined to reinstate petitioner. Thus, the instant action, instituted in December 1968, was timely filed. We have further determined that the present pleadings do state a valid claim for reinstatement, since the *Vogel* decision, in invalidating the Levering Oath on constitutional grounds, removed the sole basis of support for the dismissal of petitioner. Finally, we have concluded that whereas petitioner is entitled to the restoration of benefits which he had obtained prior to his dismissal in 1950, he cannot recover lost pay or pension benefits accruing between 1950 and his request for reinstatement in 1968.

Petitioner, a victim of the repressive political climate of the post-war era, has now remained forcibly separated by the state from his chosen profession of college teaching for more than 20 years. In holding that this court's ultimate vindication of Professor Monroe's long-held First Amendment convictions in *Vogel* entitles him to reinstatement, we do no more than recognize that there now remains no constitutionally permissible grounds for continuing petitioner's exile from the state college system. As one observer of the events of the 1950 era recognized, the Levering Oath's operation was particularly pernicious because "[n]o opportunity [was] afforded [to one who declined to take the oath] to [explain that] his refusal to sign [was] prompted by conscientious scruples and noble motives" (Stewart, Year of the Oath, p. 149 (appendix)); the oath's assumption of "guilt by association" was automatic and irrefutable. In light of *Vogel*, the state can no longer justify continued exclusion from the public university community of all those who chose to rebel against this form of "guilt by association."

Although in the instant matter the legal process is not so constituted as to give full financial relief to petitioner, the compensation must lie, not in monetary recompense, but in this ultimate vindication of the redoubtable right of free expression.

The judgment is reversed.

Wright, C. J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Schweitzer in the opinion prepared by him for the Court of Appeal in *Monroe* v. *Board of Trustees* (Cal.App.) 95 Cal.Rptr. 704.

Respondent's petition for a rehearing was denied January 26, 1972. McComb, J., was of the opinion that the petition should be granted.